**UNITED STATES of America,**
v.
**Frank COSTELLO, Defendant.**

United States District Court
S. D. New York.
Dec. 16, 1957.

Paul Williams, U. S. Atty. for the Southern Dist. of New York, New York City, for United States, Arthur H. Christy, Chief Asst. U. S. Atty., Jerome J. Londin, Asst. U. S. Atty., New York City, of counsel.

Edward Bennett Williams, Thomas A. Wadden, Jr., Washington, D. C., Hays, St. John, Abramson & Heilbron, Morris Shilensky, New York City, for defendant.

McGOHEY, District Judge.

The defendant, who was convicted in May, 1954 for wilful attempts to evade income taxes, has moved to set aside the conviction and for a new trial, on the ground of newly discovered evidence. A hearing was held at which he introduced voluminous exhibits and the testimony of 29 witnesses in addition to his own. Upon the conclusion of his presentation, the Government moved that his motion be denied and his claims dismissed on the ground that he had failed to make a prima facie case. At the Government's request, the hearing was adjourned pending decision on its motion.

On the facts and conclusions hereafter set forth, the defendant's motion is in all respects denied.

The defendant's motion, initially, was grounded on two claims: that at his trial the Government introduced material evidence which was the fruit of illegal wire taps; and that the Government "had available to it the content of intercepted telephone conversations between [him] and his counsel concerning their preparation of his defense" thus denying him "effective assistance of counsel and the fair administration of justice."

During the hearing the defendant twice requested and was granted leave to amend his motion by alleging additional claims. The first of these was that, at his trial, the Government introduced material evidence which was inadmissible because obtained through unlawful interference with his mail in violation of Title 18 U.S.C. §§ 1701, 1702, 1703; and the Fourth Amendment of the United States Constitution. The second was that, prior to his trial, Government agents had inspected the income tax returns of the persons on the panel of jurors drawn for the term of court during which he was tried; that this constituted a violation of the "statutes and regulations dealing with the confidentiality of income tax returns" and resulted in a trial jury which did not represent a true cross-section of the community, thus depriving him of an impartial jury in violation of the Sixth Amendment of the United States Constitution.

The indictment on which the defendant was tried was filed on March 11, 1953. It charged wilful attempts to evade payment of income taxes due in each of the years 1946 through 1949. After a trial which lasted from April 5 to May 13, 1954, the jury acquitted him on the first count, which related to the year 1946, and convicted him on the remaining counts, each of which related to a subsequent year. He was sentenced on May 17, 1954, to a term of five years on each count, to run concurrently, and to pay a fine of $10,000 on each count and the costs of prosecution. The Court of Appeals reversed as to the second count and affirmed as to the third and fourth counts.[1] The Supreme Court granted certiorari, but only to review the suffi-

1. 2 Cir., 221 F.2d 668.

ciency of the evidence before the grand jury, and affirmed [2] on March 5, 1956.[3]

The claims will be considered in order.

## I.

## Evidence Obtained Through Wire Taps.

During the years from 1934 to 1937, Mellin, an Internal Revenue Agent, installed taps on the telephones of persons in New York who were believed to be associated with Costello. Of these persons he recalled but one, named Schlime, on whose telephone he installed a tap in 1937. Some time during that year he was sent to New Orleans where he worked for one week on an investigation which resulted, some years later, in an indictment in New Orleans charging Costello, his known business associate Kastel and others with conspiracy to evade wilfully, income taxes due from Kastel.[4] While there he installed taps on the telephones of two persons who were believed to be associated with Costello, and also on a telephone in a hotel room which he assumed was to be occupied by Kastel.

Upon his return to New York, Mellin was assigned to assist in investigations involving several persons of whom Costello was one. He recalled but one tap, installed by him thereafter, which related to the investigation of Costello. That was in 1948, on the home telephone of an Internal Revenue Agent named Schoenbaum who was suspected of consorting with Costello. He installed this tap merely to ascertain if Schoenbaum was then at home, and promptly removed it when he learned Schoenbaum was out. This did not result in the interception of any conversation to which Costello was a party.

There were two additional taps installed by Mellin which he did not mention. One of these was testified to by his former superior, Ronayne, at whose direction Mellin, in 1937 or 1938, installed a tap on the telephone of an unnamed person, other than Schlime, believed to be an associate of Costello. Ronayne did not listen in on this tap and did not recall what information, if any, was obtained through it. He could not recall ever receiving any purported transcription or recording of conversations intercepted through this tap. The second additional tap by Mellin was testified to by Agent Cheasty. This was installed in 1936 or 1937 on a telephone in a hotel room in New York City. It was made in the course of an investigation of one Seymour Weiss of New Orleans who, it was expected, would occupy the room with Costello and Kastel. This tap was so devised that the telephone instrument served as a dictagraph capable of picking up conversations within the room as well as those which passed over the telephone wire. Cheasty monitored this tap "part of the time," but did not overhear any conversation of or concerning Costello. The other agent who monitored it, one Dineen, was not called. Cheasty's recol-

2. 350 U.S. 359, 76 S.Ct. 406, 100 L.Ed. 397.

3. Costello, having been denied bail pending appeal, by this Court and the Court of Appeals, surrendered on May 17, 1954. Shortly thereafter, in a series of income tax cases in which, as in this, the prosecution had been built on the "net worth-expenditures method," the Supreme Court granted certiorari to review the propriety of that method of proof. See Holland v. U. S., 348 U.S. 121, at page 125, 75 S.Ct. 127, at page 130, 99 L.Ed. 150. Because of this, the late Justice Jackson, on June 18, 1954, admitted Costello to bail. Subsequent to the Supreme Court's affirmance of his conviction and the denial of several motions for various forms of relief, Costello again surrendered on May 14, 1956, and served until March 11, 1957, when the Supreme Court again admitted him to bail pending decision on his appeal from the denial of a motion to set aside his sentence on the ground that it was greater than the court had power to impose. This was decided against him on June 3, 1957, 353 U.S. 978, 77 S.Ct. 1281, 1 L.Ed.2d 1140, after his present motion was filed. He is still free on bail, with Government consent, pending decision on his present motion.

4. The trial resulted in a directed verdict of acquittal.

lection was that the tap "didn't pick up much."

Mellin did only the mechanical work of connecting the wire for taps. He never listened in on any of the telephones he tapped, except Schoenbaum's. He did not know whether any conversation in which Costello participated was ever intercepted by means of any of the taps he installed.

Mellin could not recall ever having been instructed by a superior to tap a telephone of Costello.

When asked if he had ever installed a tap on a telephone of Costello, he answered "I absolutely don't remember." He kept a diary in which he had recorded all the taps he had ever installed. While this was not offered in evidence, he had consulted it shortly before testifying and did not find the name of Costello listed among those whose telephones he had tapped. Mellin was by no means a reticent or unwilling witness concerning his activities as a revenue agent. Indeed, shortly after his retirement he wrote an article concerning them which was published in a popular weekly of national circulation. While on the stand he was obviously anxious to tell of his activities in all the investigations of newsworthy persons in which he had participated. More than once he had to be admonished to answer responsively. It is to the last degree unlikely that he would have neither record nor recollection of tapping the telephone of a man as widely publicized as Costello, if he had ever done so. Under the circumstances there is no rational basis for an inference that he did so.

Mellin, in the course of his investigations, regularly obtained from Capt. Grafenecker of the New York Police Department, information about Costello which Mellin brought back to his superiors. This practice began in 1934 and continued until Mellin's retirement in January, 1949. While still in service he introduced two of his superiors, Ronayne and Cordes to Capt. Grafenecker who, from time to time thereafter until he retired in February, 1954, was visited by these and other agents.

Some, though not all, of Grafenecker's information had been secured through taps which the New York police had installed from time to time on Costello's home telephone and on telephones in restaurants and other places believed to be frequented by Costello and persons known or believed to be his associates. The New York police were conducting a continuing investigation begun during the early days of the prohibition era, of many persons including Costello. They had available, however, and they used, other sources of information besides wire taps. Capt. Grafenecker gave Mellin and the other Internal Revenue agents who sought his help, "everything [he] had" regardless of its source and permitted them to read the transcriptions of intercepted conversations over Costello's telephone and to make notes of their contents.

Ronayne received information directly from Grafenecker "once or twice" in 1937, but this was in connection with the New Orleans case. The information was given to Ronayne orally and he could not recall what it was, or whether he had recorded it. He thought he had not. He knew that the New York police had tapped Costello's home telephone.

Ronayne, who resigned from Government service in 1945, did not work on the active investigation which resulted in Costello's indictment here in 1953. That investigation was commenced in July, 1950 by Agent Geissler at the direction of his supervisor, Cordes. The latter, though apparently available, was not called by Costello at this hearing. Grafenecker could not specifically recall giving information to Cordes. However, he thought he had; and, in view of his long established practice, it is at least an evitable inference that he did. When Geissler commenced his investigation he found in the files, only a small one relating to Costello. This contained only general information consisting of newspaper clippings, some memoranda, a list

of names, some notes in Cordes' hand-writing and a list of toll calls made over Costello's home telephone. The latter list had been furnished by the Commissioner of Accounts of the City of New York. It did not include either summaries or transcriptions of intercepted conversations.

All of the Government agents, including Mellin, called by Costello, swore they had never asked the New York City officials to tap his or other telephones and had never assisted either in installing or monitoring such taps. Capt. Grafenecker swore to the same effect with respect to these and all other Government agents. This testimony was neither contradicted nor weakened in any way. Having seen and heard the witnesses, I accept their testimony and find that all the taps by city officials, which are involved here, were made and monitored by them alone and without the request or assistance of any kind, of Government agents.

■ Costello has failed to show (a) that at any time his telephone was tapped by federal agents; (b) that any conversation in which he participated over any telephone was ever intercepted by federal agents; (c) that any evidence adduced against him at the trial resulted, either directly or indirectly, from the interception by federal agents of any telephone conversation in which he participated.

Costello introduced no records relating to taps on his telephone by New York police prior to 1943, although presumably it was for this purpose that he had subpoenaed the wire tap files of the Police Department. A deputy Police Commissioner who appeared in answer to the subpoena, was excused by Costello and never recalled.

Grafenecker testified he "had a consistent pattern of intercepting Costello's conversations from 1943 on." He testified entirely from recollection, unrefreshed by records, and if, as Costello

contends, he meant by this that there was a continuous tap on Costello's telephone from 1943 to 1954, he was clearly mistaken. He swore that after 1942, all the taps on Costello's telephone were made pursuant to court orders issued at the request of the New York County District Attorney;[5] and that the latter had all the records of all such taps, including all transcriptions of the conversations intercepted by means of them. All of these records were produced by the District Attorney pursuant to subpoena and were examined by Costello's attorneys. They were all marked for identification and he offered 242 transcriptions, which were received in evidence. The records disclosed no taps on Costello's telephone after April 15, 1952, and before that date, during the following periods only: May 7 to November 5, 1943; June 11 to September 10, 1946; September 20, 1950 to April 15, 1952. The District Attorney's chief investigator for the last ten years, who has charge of all wire tap records, swore that he had produced every record in his office relating to taps on Costello's telephone and that after 1942 there were no such taps other than those noted above. I accept this testimony and find accordingly.

At Costello's trial, the prosecution had to establish his net worth at the beginning of each of the years 1946 through 1949 and to show his expenditures in each of those years.[6] In order to establish his net worth as of January 1, 1946, the prosecution started with his sworn statement voluntarily given, in the presence of his counsel, to Ronayne on October 18, 1937, that on that date his net worth was $40,000. The prosecution then showed that this increased in each succeeding year up to 1946. This process, of course, included proof of his expenditures during that period also. The aggregate total of annual expenditures proved at the trial for the period from October 18, 1937 through 1949, was

5. Such orders are authorized by § 813–a, New York Code of Criminal Procedure.

6. Familiarity with the net worth-expenditures method of proof is assumed. It is

described in 348 U.S. at page 125, 75 S. Ct. at page 130 and in 221 F.2d at page 670 ff.

$622,000. Of this sum, the total paid to all those whose names were mentioned in conversations intercepted by New York police officers between May 7, 1943 and April 15, 1952, was at most $155,000.[7] Almost half of this amount, however, that is, $68,800, was made up of fees and disbursements to lawyers whose professional services to Costello were matters of public record long before the indictment was filed.[8] Accordingly, the total of expenditures the evidence of which can be claimed to have been secured only from police interceptions, is at most $87,200. In Benanti v. U. S.,[9] the Supreme Court held that "evidence obtained by means forbidden by Section 605 [of the Federal Communications Act, 47 U.S.C.A. § 605], whether by State or Federal agents, is inadmissible in federal court." It is by no means certain, however, that even under this ruling the trial evidence as to each item of the $87,200 was inadmissible. The evidence at this hearing shows that many of the recipients of the payments included in this amount were never mentioned in any conversation in which Costello was a participant. As to those it is questionable that he has any standing to complain.[10] That question, however, need not now be decided because, in any event, in light of the Court of Appeals' analysis of the expenditures proved at the trial,[11] it is clear that, even if the evidence were stricken as to all the items which make up the $87,200, there would still remain sufficient expenditures, established by evidence not connected with wire taps, to support the conviction on counts three and four.[12]

Finally, Costello has not shown that the use of wire tap evidence was not known or could not have been discovered prior to the trial.[13] At this hearing he admitted knowing as far back as 1943 that his wire was tapped. There is no rational basis for believing he is so naive as to have supposed that the practice which then proved so fruitful for the State investigation was discontinued. Indeed the transcriptions which he put in evidence here of his conversations after 1943, show unmistakably that he suspected they were being intercepted.

### II.

### Effective Assistance of Counsel Denied by Use of Wire Taps.

■ There is no evidence whatever to sustain this claim which is, as already noted, that the prosecution "had available the content of intercepted telephone conversations between Costello and his counsel concerning their preparation of his defense," thus denying him "effective assistance of counsel and the fair administration of justice."

---

7. All amounts are stated in round numbers. The total in the pre-indictments years was $67,500. In the indictment years it was $87,500. The amounts proved at the trial appear in Exhibits 362C and 362D—"Appellant's Appendix to Brief, Vol. IV, Exhibits" in the Record on Appeal to the Court of Appeals. Those associated with wire taps are taken from the testimony at this hearing of Mr. Wadden, one of Costello's counsel, based on his examination of the District Attorney's wire tap records.

8. The professional services were rendered by Mr. George Wolf and Messrs. Greenbaum, Wolff & Ernst, a law firm with which George Wolf is not connected. The firm represented Costello in litigation with the Government before the Tax Court in 1943; and later in Treasury administrative proceedings. George Wolf represented Costello at public hearings held by a Senate Committee in 1951 and 1952. He also represented him in 1943, in court proceedings which related to the New York City election of that year and received the widest publicity.

9. 78 S.Ct. 155, 157.

10. See Goldstein v. U. S., 316 U.S. 114, at page 121, 62 S.Ct. 1000, at page 1004, 86 L.Ed. 1312, and the cases there cited.

11. 221 F.2d 671 through 673.

12. See United States v. On Lee, 2 Cir., 201 F.2d 722, at page 723; Weiss v. U. S., 5 Cir., 122 F.2d 675, at page 691, certiorari denied 314 U.S. 687, 62 S.Ct. 300, 86 L.Ed. 550, rehearing denied 314 U.S. 716, 62 S.Ct. 478, 86 L.Ed. 570.

13. See United States v. Hiss, D.C., 107 F.Supp. 128, affirmed, 2 Cir., 201 F.2d 372, certiorari denied 345 U.S. 942, 73 S.Ct. 830, 97 L.Ed. 1368.

Costello asserts in an affidavit in support of his motion that, "before and during the trial herein I held innumerable conferences, by means of my personal telephone, with my counsel, Joseph Leary Delaney, Esquire, Leo Fennelly, Esquire, and George Wolf, Esquire, concerning the preparation of my defense herein * * *." Such preparation certainly could not have been started prior to March 11, 1953 when the indictment was returned, and there were no wire taps on Costello's telephone after April 15, 1952.

The only lawyers who appeared for Costello in the defense of this case were Mr. Delaney, whose notice of appearance was filed on March 12, 1953, and Mr. Fennelly, who first appeared on a pretrial motion in November, 1953. Mr. Wolf did not appear as counsel in this case at any time. He was a witness at the trial. He was called by the prosecution and, all objections as to privilege having been expressly waived, testified concerning expenditures by Costello in 1943 and subsequent years.

Costello put in evidence at this hearing, some fifty-four transcriptions of intercepted conversations over his telephone, in which Mr. Wolf participated. The earliest of these occurred on August 2, 1943, and the latest on March 20, 1952. Approximately forty were very brief calls by Mr. Wolf to arrange appointments and he did not always speak to Costello. Seven were very brief calls by Costello to arrange appointments with Mr. Wolf. In a few instances Mr. Wolf made calls to his office from Costello's home, to inquire of his secretary about other appointments. In a few instances Mr. Wolf called some one at Costello's home whom he addressed as "Bobby." The conversations with Bobby were in no way related to this case. In one call from Costello's home made on March 17, 1951, Mr. Wolf spoke to Mr. Delaney and advised the latter not to wait for him. Mr. Wolf also inquired and was informed by Mr. Delaney when the "Court of Appeals" would next be in session. This conversation occurred two years before this indictment, during the period in which Costello was a witness at hearings held in New York City by the Senate Special Committee to Investigate Organized Crime in Interstate Commerce, of which Senator Kefauver was chairman. Mr. Wolf appeared as Costello's counsel at those hearings.

Although Costello's attorneys at this hearing had available for examination and study all of the New York County District Attorney's wire tap records, not one was offered relating to a conversation between Costello and either Mr. Delaney or Mr. Fennelly or between the latter.

On March 4, 1954, one month before the trial started, two Assistant United States Attorneys examined at the office of the New York County District Attorney the latter's records of taps on Costello's telephone. They did not see or examine any summaries or transcriptions of conversation intercepted in the years 1950, 1951 and 1952, nor were these discussed. They examined only eight cards containing summaries of intercepted conversations of which six occurred in 1943 and two in 1946. None of Costello's lawyers was a participant in any of these eight conversations. The prosecutors also were told by the District Attorney's Chief Investigator, the names of the persons who participated in six additional conversations intercepted in those two years. They were not interested in the latter and they did not examine either the summaries or transcriptions of them. One of them related to a conversation intercepted on August 14, 1946, between Mr. Wolf and the defendant. There was ample reason for the prosecutors to disregard this. It related to one of Costello's financial transactions which he had disclosed to the Government early in 1945. The transcription of this conversation, though marked for identification, is not one of the 242 he offered in evidence. Nevertheless, I have examined it. It shows that Mr. Wolf asked and received permission to come on short notice to Costello's home with some "statements" concerning a commercial building at 79 Wall Street which Costello then owned. At the trial Mr. Wolf testified

concerning the purchase of this property for cash by Costello in May, 1944.[14] Prior to this testimony, the prosecution had introduced Costello's income tax return filed on March 15, 1945, in which he reported income received during 1944 from the property.[15] Thus Costello had directly informed the Government of his connection with it almost a year and a half before the conversation was intercepted, and almost eight years before the indictment was filed. The conversation clearly did not relate to the preparation of his defense to the indictment.

### Unlawful Interference with the Defendant's Mail.

■ Shortly after Geissler commenced his investigation of Costello's taxes in July, 1950, there was instituted, at his request, a "watch" of mail addressed to the defendant and his wife at their homes. This was authorized by the postal regulations.[16] It was thereafter maintained for periods of two weeks each, every two or three months, until the case was referred to the United States Attorney early in 1953. The two weeks in each period were the last week in one month and the first week of the following month, the period in which bills are customarily received. The watch covered mail addressed to the Costellos' apartment in New York City and to their country home at Sands Point, Long Island.

A mail watch is conducted in the following manner. When mail is received at a local post office for delivery within its territory, it is sorted by clerks who separate it according to delivery routes in areas where delivery is made by carriers; and according to the addressee's name only, in areas where it is not delivered by carriers but has to be called for by the addressee. The clerks are instructed to observe all mail subject to a watch and to give to a supervisor those pieces which bear the name and address of the sender. The supervisor records these names and addresses, returns the mail to the appropriate route bag or box and thereafter forwards the senders' names and addresses to the official who requested the watch. The foregoing procedure was followed here.

The relevant statutes are the sections of Title 18 U.S.C. set forth in the margin.[17]

---

14. See Record on Appeal, pp. 989a ff.

15. Id. Ex. 8, pp. 90a, 92a.

16. Postal Laws and Regulations, 1948 Ed. Title 5 § 41.4(b) provides in pertinent part as follows: "Upon official request of a representative of another executive department, agency, or independent establishment of the Federal Government and the presentation of proper credentials, postmasters may, when practicable, furnish for official use information regarding the addresses, return cards, or postmarks on mail matter, provided the labor involved in complying with the request does not interfere with postal business, or result in material cost. Such mail shall not be withheld from the addressee nor delayed in delivery. * * *."

17. Section 1701:
"Whoever knowingly and willfully obstructs or retards the passage of the mail, or any carrier or conveyance carrying the mail, shall be fined not more than $100 or imprisoned not more than six months, or both."
Section 1702:

"Whoever takes any letter, postal card, or package out of any post office or any authorized depository for mail matter, or from any letter or mail carrier, or which has been in any post office or authorized depository, or in the custody of any letter or mail carrier, before it has been delivered to the person to whom it was directed, with design to obstruct the correspondence, or to pry into the business or secrets of another, or opens, secretes, embezzles, or destroys the same, shall be fined not more than $2,000 or imprisoned not more than five years, or both."

The portion of Section 1703 on which the defendant relies is as follows:

"(a) Whoever, being a postmaster or Postal Service employee, unlawfully detains, delays, or opens any letter, postal card, package, bag, or mail intrusted to him or which shall come into his possession, and which was intended to be conveyed by mail, or carried or delivered by any carrier or other employee of the Postal Service, or forwarded through or delivered from any post office or station

It is not claimed and, in any event, there was no evidence whatever that the Costellos' mail was permanently withheld from them; or destroyed, or opened; or its contents examined. It is claimed, however, that this watch resulted in "some" delay and thus the Costellos' mail was (a) "retarded" in violation of Section 1701; (b) "taken" with design to pry into his business or secrets, in violation of Section 1702; (c) "detained" and "delayed" by a postal employee in violation of Section 1703.

The Port Washington post office processed the mail addressed to the Costellos at Sands Point. Residents of that place were not served by mail carriers. They had to pick up their mail from individual boxes assigned to them at the post office. The Costellos' Sands Point mail was not delayed as a result of the watch.

The postal regulations permit delivery in bulk of all mail addressed to tenants in a large apartment house such as that in which the Costellos resided in New York City.[18] Their's was within the territory served by the Ansonia station, which processed and delivered in bulk mail addressed to all tenants in their house. Distribution to the tenants was made by an employee of the house, designated "the mail clerk."

Six clerks and two carriers employed at the Ansonia station during the periods when his mail was subject to the watch and "the mail clerk" and "hall captain" of his apartment house during those periods, were called by Costello to testify about the handling of his mail. He also testified concerning it. He did not say that his mail was delayed at any time. He did say, however, that he had never made a complaint about delay. The testimony of the Ansonia clerks was in conflict. Some said there was no delay. Some said there was bound to be delay. Some said that while delay was possible, it was not inevitable. On this conflicting testimony I find that, while not inevitable, some delay was probable, but only to a very limited extent, i. e. of such mail as reached the Ansonia station just shortly before the carriers were to start out on their deliveries. Such mail, however, would be ready for the following delivery. As to mail which reached the station after the last delivery on any day and during the succeeding night and early morning hours, there was no possible reason for it to be delayed unless it be assumed the clerks and supervisors made a point of deliberately and systematically disregarding the regulations against delay. There is no possible basis in the evidence for such assumption. As to such mail, therefore, I find there was no proof that it was delayed.

The "mail clerk" at the apartment house testified in substance as follows. On each day during two of the two-week periods, the carrier demanded and retrieved from this clerk all of the Costellos' mail which the carrier then brought back to the station and redelivered the following day. He was not certain whether the carrier who did this was Johnson or Folson, but thought it was the former. Johnson allegedly showed the clerk a copy of the mail watch directive as his authority for demanding the return of the Costellos' mail. Although the clerk did not say he was given a copy of the directive, the "hall captain" testified that the "mail clerk" not only told him about the carrier's demand, but also showed him the directive. Johnson denied he had ever shown the directive to the "mail clerk" or retrieved the Costellos' mail. Folson "to the best of [his] recollection" denied the alleged occurrences. The apartment house employees impressed me as being anxious to aid Costello's cause. They are, after all, long-time employees in the house where he lives and, it is fair to assume, have been in the past and expect in the future to be the recipients of his

thereof established by authority of the Postmaster General; or secretes, or destroys any such letter, postal card, package, bag, or mail, shall be fined not more than $500 or imprisoned not more than five years, or both."

18. Title 39 § 97.1 Code of Federal Regulations (Rev. 1955).

gratuities. The carriers, on the other hand, are not without interest either. They undoubtedly have a motive to deny they violated the postal regulations. Nevertheless their testimony seems more consistent with the inherent probabilities of the situation. While it is possible that, on occasion, a carrier may have been directed to check on Costello's mail if the supervisor thought the clerks at the station were not effectively carrying out the watch, it seems incredible that this would have occurred day after day during two separated two-week periods. Moreover there was never any need to bring the Costellos' mail back to the station. Costello testified that his mail averaged only about forty pieces a week; that is, about five or six pieces a day. It would, then, be much more convenient merely to have the carrier note the necessary data at the apartment house and thus avoid forbidden delay. It is to the last degree unlikely that the supervisor and carriers would publicly expose themselves unnecessarily to complaints from Costello who, they would surely suppose would be told by the "mail clerk" and "hall captain" if day after day his mail was taken back by the carriers. The present Superintendent of the Ansonia station swore that in 37 years in the postal service he had never heard of this being done. The testimony of the "mail clerk" and "hall captain" is rejected.

■ There was no "taking" of the Costellos' mail with intent to deprive them of it.[19]

■ It was not prying into their business or secrets to note what the senders had made public on the face of the letters.[20]

■ And the mere fact of detention without proof that it was for an unlawful purpose is insufficient to constitute a violation of the statute.[21]

Any delay here was merely incidental to a lawful watch authorized by the postal regulations.

The evidence shows no violation of Costello's rights under the Fourth Amendment.

In any event, the total of the expenditures shown to be related to the mail watch was too small to have counted. They amounted to $104 in the period prior to 1946 and to $16,800 in the period after 1946. If the evidence as to all these were to be stricken, together with the expenditures related to the wire taps, there would still remain sufficient expenditures established by untainted evidence to sustain the conviction on counts three and four.

### Deprivation of the Right to an Impartial Jury.

■ The evidence wholly fails to sustain this claim.

Prior to the trial the Chief Assistant United States Attorney who was in charge of the prosecution requested revenue agents assisting him, to inspect the 1952 income tax returns of the 360 persons whose names appeared on the panel of jurors drawn for the April, 1954 term of court. These agents requested the District Directors of the Lower and Upper Manhattan Districts and the Albany District to make available the returns filed by members of the panel in their respective districts. Agent Geissler then visited each district office and inspected all the returns made available by the District Director. These amounted to about 150 for the three districts. This is less than half the number of prospective jurors. The reason for the difference was not much inquired into and it was not explained. Geissler, however, impressed me as truthful and reliable, and I accept his estimate of the number he was given to examine. He made notes

19. See United States v. Maxwell, D.C., 137 F.Supp. 298 and cases there cited; affirmed, 8 Cir., 235 F.2d 930.

20. See Ex parte Jackson, 96 U.S. 727, 24 L.Ed. 877.

21. Fliashnick v. U. S., 2 Cir., 223 F. 736, at page 738. See also United States v. Kirby, 7 Wall. 482, 74 U.S. 482, 19 L.Ed. 278.

of the following data on the returns: occupation, amount and source of income, amount of taxes paid, number of dependents, amount of any refund, and any unusual deductions. The prosecutor, to whom this information was given, used it together with other information in reaching his determinations as to challenges.

■ Costello makes two contentions as to this. The first is that it violated "the statutes and regulations dealing with the confidentiality of income tax returns." This can be disposed of shortly. The inspection was expressly authorized by Section 458.204 of Title 26 of the Code of Federal Regulations (1949 Ed.) [22] Moreover, since the inspected returns were those of others, Costello has no standing to complain about a violation, if there was any, of their rights.[23]

The second contention is that the inspection resulted in a jury "specially conditioned to return a verdict of guilty." This, as will appear, is completely unsupported by the evidence at the hearing and is, moreover, refuted by the jury's verdict of acquittal on the first count.

The Chief Assistant United States Attorney, for his convenience at the trial, placed after each name on his copy of the jury panel a number, from 1 to 4, and in some instances letters also. No testimony was adduced concerning the significance of the letters, but the numbers represented the prosecutor's order of preference among the prospective jurors. The prosecutor's marked copy of the list was produced and examined by the court together with the trial transcript of the jury selection. The examination disclosed the following facts which were announced in open court.[24] Seven men and five women comprised the twelve jurors who rendered the verdict. They did not include any of the three alternates. Four jurors were housewives and eight were employed in private industry. Eight were in class one, two were in class two, two were in class three. The prosecutor exercised only five of the six peremptory challenges permitted him. Of those he challenged, two were in the second and three were in the third class.

There is no contention, and certainly there is no proof, that any member of the panel was subjected to surveillance by Government agents either before or dur-

22. § 458.204 Use of Returns in Litigation. The return of an individual, partnership, corporation, or fiduciary, or a copy thereof, may be furnished to a United States attorney for official use in proceedings before a United States grand jury or in litigation in any court, if the United States is interested in the result, or for use in preparation for such proceedings or litigation; or to an attorney of the Department of Justice, for like use, upon written request of the Attorney General, the Assistant to the Attorney General, or an Assistant Attorney General. If a return or copy is thus furnished, it shall be limited in use to the purpose for which it is furnished and is under no condition to be made public except to the extent that publicity necessarily results from such use. The original return will be furnished only in exceptional cases, and then only if it is made to appear that the ends of justice may otherwise be defeated. Neither the original nor a copy of a return desired for use in litigation in court will be furnished if the United States Government is not interested in the result, but this provision is not a limitation on the use of copies of returns by the persons entitled thereto.

23. See Goldstein v. U. S., 316 U.S. 114, at page 121, 62 S.Ct. 1000, at page 1004, 86 L.Ed. 1312.

24. The list, which was not made available to the defendant for the following reason, was sealed and made part of the record as Court's Ex. 2. It seemed undesirable to expose the panel members to possible embarrassment by disclosing their classifications in circumstances like these, in which such disclosure could not possibly add anything of material substance to the defendant's proof. Since he was informed of the three classes into which the jurors fell and the number of jurors in each class, the identity of those in each class is immaterial.

ing the trial.[25] According to the testimony of the agents and the prosecutors, no person on the panel was told that his return had been inspected, nor was any panel member interviewed by a Government representative either before or, except in open court on the voir dire, during the trial. The defendant, who had available the names of the jurors who passed on his guilt, as well as the others on the panel, did not call any of them to contradict this testimony and so, as there is no other reason to doubt it, I accept it and find accordingly. I also find, on this testimony, that the provisions of the Regulation as to use of the returns and avoidance of publicity concerning them were carefully complied with; and that the sole purpose and result of the inspection was the ascertainment of relevant information about the prospective jurors which the prosecution considered, in confidence, in exercising its challenges.

At the trial defense counsel were afforded full opportunity, which was exercised, to examine each juror directly, before exercising the ten challenges allowed the defendant. He complains, nevertheless, that he was denied information possessed by the prosecution as a result of the inspection which, if available to him, might have aided him in exercising his challenges. This, however, is not ground for a new trial. The prosecution, to be sure, may not suppress evidence which may tend to disprove the charge on which a defendant is being tried.[26] But the court knows of no rule or ruling, and the defendant has cited none, which requires the prosecutor to divulge the data which he relies on in challenging prospective jurors.

The defendant's motion to set aside his conviction and for a new trial is in all respects denied.

It is so ordered.

25. See Sinclair v. U. S., 279 U.S. 749, 49 S.Ct. 471, 73 L.Ed. 938; Rubenstein v. U. S., 10 Cir., 227 F.2d 638.

26. See Alcorta v. State of Texas, 78 S.Ct. 103.