Marvin R. COLE, Appellant,

v.

**UNITED STATES** of America,
Appellee.

No. 18807.

United States Court of Appeals
Ninth Circuit.

March 16, 1964.

Certiorari Denied June 1, 1964.

See 84 S.Ct. 1630.

---

Joseph A. Ball, Ball, Hunt & Hart, Long Beach, Max F. Deutz and Herman F. Selvin, Los Angeles, Cal., for appellant.

Francis C. Whelan, U. S. Atty., Timothy M. Thornton, Asst. U. S. Atty., Chief, Sp. Prosecutions Section, and Benjamin S. Farber, Asst. U. S. Atty., Los Angeles, Cal., for appellee.

Before BARNES, MERRILL and KOELSCH, Circuit Judges.

BARNES, Circuit Judge:

An indictment in two counts was found by a grand jury charging appellant Marvin R. Cole with obstructing the due administration of justice, made a crime by 18 U.S.C. § 1503.

That section reads as follows:

"Influencing or injuring officer, juror or witness generally.

"Whoever corruptly, or by threats or force, or by any threatening letter or communication, endeavors to influence, intimidate, or impede any witness, in any court of the United States or before any United States Commissioner or other committing magistrate, or any grand or petit juror, or officer in or of any court of the United States, or officer who may be serving at any examination or other proceeding before any United States commissioner or other committing magistrate, in the discharge of his duty, or injures any party or witness in his person or property on account of his attending or having attended such court or examination before such officer, commissioner, or other committing magistrate, or on account of his testifying or having testified to any matter pending therein, or injures any such grand or petit juror in his person or property on account of any verdict or indictment assented to by him, or on account of his being or having been such juror, or injures any such officer, commissioner, or other committing magistrate in his person or property on account of the performance of his official duties, or corruptly or by threats or force, or by any threatening letter or communication, influences, obstructs, or impedes, or endeavors to influence, obstruct, or impede, the due administration of justice, shall be fined not more than $5,000 or imprisoned not more than five years, or both."

Count I charges appellant with "corruptly" endeavoring "to influence, intimidate and impede" one Joel R. Benton (who was a witness before a certain grand jury investigation) in connection with certain testimony he might give, and Count II charges appellant with "corruptly and by threats" endeavoring "to influence, intimidate and impede" the same Benton (a witness before a second grand jury) in connection with certain testimony he might give.

Cole was found guilty by a jury on both counts. Appellant was fined $1,000 on each count concurrently, or a total fine of $1,000.

To understand appellant's theory, we quote from the "Introductory Statement" appearing in appellant's brief:

"Joel R. Benton was a friend and former employee of Cole. Benton had been orally requested to appear before a Federal grand jury. He was, however, deeply concerned and frightened over the prospect of such an appearance because he had executed and filed with a committee of the United States Senate, the so-called McClellan Committee, a false statement and affidavit. He came to Cole for advice, telling him about this perjury and of his intention simply to stand on the false statement, thus in effect repeating the perjury, before the grand jury. Cole advised Benton against this obviously improper course, and offered as the solution of Benton's problem the suggestion that he claim his constitutional privilege against self incrimination. Benton did. Later he turned informer; and as a consequence of Cole's advice to Benton to do what the latter admittedly had a perfect and lawful right to do, Mr. Cole finds himself convicted on two counts of violating section 1503. [note] It is from that judgment of conviction that he appeals.

"The basic and determinative question raised by this appeal is whether advice to claim the constitutional privilege, which advice does

not have and was not designed to have any consequence in the way of influencing the witness to violate any of his duties as a witness or in the way of bringing about an effect upon the administration of justice that is undue, corrupt or unlawful, can be as a matter of law the crime defined by section 1503. It is the appellant's contention that there is not and cannot be any obstruction of justice within the meaning of that section when there is no endeavor or effort to get the witness to do anything wrong in relation to his duties as a witness. Every witness has the constitutional right to refuse to testify on grounds of possible self-incrimination; accordingly, he violates no duty as a witness when he invokes that right; and one who tries to influence or induce or persuade him to invoke it, therefore, does not endeavor to get the witness to do anything wrong."

The errors claimed are two: One, that the court erred in denying appellant's motion for an acquittal, and two, the evidence is insufficient to support the verdict of guilty.

Jurisdiction existed below, and appeal lies here. 28 U.S.C. §§ 1291 and 1294 (1).

## I—FACTS

The facts are many and complicated. Appellant's recital covers twenty-three pages of its brief; appellee's covers fifteen. The latter recital, slightly modified and corrected to be less argumentative, is attached hereto as Appendix A, and we adopt it as part of this opinion.

We note also it was stipulated that during all the times herein mentioned Cole knew he was under investigation by a grand jury for possible perjury and the obstruction of the due administration of justice.

## II—ARGUMENT

■ Appellant first urges that § 1503 has implicit in it a limitation of its literal language; that it cannot proscribe criminal acts consistent with the due ad-

ministration of justice, such as influencing a witness to tell the truth. We agree. (That is not this case. Cole here never urged or advised Benton to tell the truth.) We likewise agree with appellant that "the limitation on the literal language of the statute must be that *only that is proscribed which produces or which is capable of producing an effect that prevents justice from being duly administered.*" (Emphasis, except as to the word "duly," is this court's. Appellant's Opening Brief, p. 28.)

■ Appellant then argues to us (and again we agree):

"The constitutional privilege against self-incrimination is designed to protect the innocent as well as the guilty. It is an inalienable right that every witness has. It is, therefore, an important and integral part of the due administration of justice. A witness who claims it exercises only his constitutional right. When *he* does so, *he* does not, therefore, obstruct the due administration of justice or do anything contrary to his duties as a witness." (Emphasis added.)

■ Again, we concur emphatically. But it is from here on that this court parts company with appellant's argument. Appellant continues:

"That being so, it cannot be a crime for one to advise or persuade him to do that which is lawful and his absolute right, and which, because of that fact, is not a corrupt or otherwise wrongful obstruction of the due administration of justice."

With that conclusion, we cannot agree. It neither necessarily nor logically follows. What the statute attempts to prohibit is the "endeavor * * * to influence * * * any witness" corruptly or by threats or force or by any threatening letter.

Many acts which are not in themselves unlawful, and which do not make the actor a criminal, may make another a criminal who sees that the innocent act is

accomplished for a corrupt purpose, or by threat or by force.

If in a kidnapping for ransom case "X" hires or by force and/or threat requires a messenger boy to pick up a box containing the ransom money at a certain spot and deliver it to the kidnapper, can the kidnapper escape liability for *his* corrupt act, by claiming it was lawful because the person he influenced was acting within his legal rights, and was himself innocent? Should either a despotic leader of a financially strong labor union, or an extremely successful manipulator in big business operations on Wall Street, be permitted to effect the withholding of testimony in a court of law or before a grand jury which might aid in convicting him of some violation of law, by permitting him to pay any sum, or intimidate in any way, one to one hundred witnesses who might testify against him, and who themselves are not being investigated, because *they* have the right, individually, to invoke the Fifth Amendment when called upon to testify? Such a thesis is not morally, and in our opinion, not legally sound.

According to appellant's theory, no matter how much money one pays a witness not to testify before a grand jury—whether $1,000 or $100,000; nor how many witnesses are paid such sums, and no matter what threats or force are used, and no matter *how corrupt the purpose* which the payer of such money may have for urging the witness to claim *his* (the witness') Fifth Amendment right—is of no consequence. "Its exercise [that of the constitutional privilege] is lawful and effective *regardless of the inducing cause.*" (Emphasis added. Opening Brief, p. 29.)

That the inducing cause is immaterial insofar as the witness is concerned, we affirm. That this lawfulness wipes out the criminality of the inducer, acting with corrupt motive, we cannot agree. It is the *witness'* privilege which our inspired Constitution protects and which any person in our courts may invoke, whether he be upright citizen or foul criminal; not someone else's privilege to

capture by force or threat or bribe; and thus be enabled to prostitute one of the great cornerstones of our freedom under law.

To hold otherwise, would obstruct the due administration of justice, and we refuse to so hold. The sacred right to guard against self-incrimination is not negotiable, any more than is virtue. It is an absolute personal right, and as appellant urges, truly inalienable, insofar as any attempt may be made to transfer it for or to the benefit of someone else.

Nor need we become involved here with "advice" to claim the privilege, whether given by attorney to client, doctor to patient, priest to penitent,—one spouse to another, or even the "honest" advice of one friend to another. The advice by the attorney relates to and is an exercise of the client's right; not the attorney's— the advice by the priest relates to and is an exercise of the penitent's right, not the priest's. Even the husband and wife's confidential privilege rests upon the theory the two are one in the eyes of the law. Whether, if such advice were corruptly given by attorney, priest or doctor, the policy of the law would uphold the privilege despite the resultant obstruction of the due administration of justice, we need not here decide. Suffice it to say, neither the attorney's nor the doctor's privilege, nor the privilege of one spouse, is absolute in all cases.

"If the claim of the privilege," urges appellant, "is not a wrongful obstruction of the due administration of justice, the giving of advice to claim it obviously cannot be." If by this, reference is had to honest, uncorrupt, disinterested advice, we agree. If it is not, we do not agree, for reasons appearing above.

Appellant urges his position is supported by various cases, particularly United States v. Herron, N.D.Cal., 1928, 28 F.2d 122, 123, as well as Rosner v. United States, 2 Cir. 1926, 10 F.2d 675, 676; Harrington v. United States, 8 Cir. 1920, 267 F. 97; Taran v. United States, 8 Cir. 1959, 266 F.2d 561, 567. Only the first of these seems in point.

We do not read Harrington v. United States, supra, as contrary to our position here. There the court said, and properly so:

"It is not an unlawful attempt to influence or impede a witness, or the due administration of justice, for one to seek to obtain from a witness a statement of the facts as he believes them to be, without the exercise of undue influence, even though such a statement may conflict with prior testimony given by the one making the statement. Such an effort is not regarded with favor, because of the temptation to influence the witness unduly; but the mere request for a statement *believed to be true* does not offend against the statute * * * *because it is not corrupt conduct*." (Emphasis added. Id. 267 F. at 101.)

Again, the court said:

"[B]ut there was no evidence tending to show that Scattergood was consciously attempting to obtain a statement of a falsehood." (Id. 267 F. at 101.)

Thus the intent or motive of the party charged as an inducer is of importance.[1]

Taran v. United States, supra, involved the false statements as to arrests and convictions made by the defendant to the Minnesota Board of Pardons which induced that Board to grant him a pardon. He was convicted for his false statements, but his conviction was reversed, upon the ground that the jury could not make a collateral exploration into *why* the defendant was pardoned; that the deportation statute accords a pardon legal finality and conclusiveness. That case is inapplicable to the facts here present.

In Rosner v. United States, supra, the defendant was convicted, having been charged with advising another person to disregard a letter from a United States Attorney *requesting* that other person to plead to an information against him. Was such advice an attempt to obstruct the due administration of justice? It was not, said the Third Circuit, for:

"[S]ince a disregard by [the defendant] of an oral request by the United States attorney would not have been obstructing the administration of justice, because justice is not administered that way, so advising Miller to disregard substantially the same request is not a violation of the statute."

The letter was not process, "nor is it specifically authorized by any statute of the United States." (Id. 10 F.2d at 676.)

That may well be sound law, but has no applicability here.

In United States v. Herron, supra, appellant presents a case whose facts and holding seem directly in point.

There, in the last two paragraphs of the opinion, Judge Louderback stated:

"The witness himself, therefore, is protected in his claim of privilege by being allowed the privilege, irrespective of his motive for claiming the same."

With this we agree. He then stated:

"In this case the defendant Herron [the attorney] is charged with influencing, by advising, the witness Rasmussen to claim a lawful privilege, and I do not believe it is the law or the policy of the law to make criminal, no matter what the motive might have been, the advising of a witness to do that which was lawful and *would in fact* have protected the witness from disclosing self-incriminating matter." (Id. 28 F.2d at 123. Emphasis by the court.)

Except for proof of the fact that the plea of privilege *would in fact* have protected the witness from self-incriminating matter,[2] the facts in Herron are similar to those here existing—for Herron

---

1. We note the conviction was reversed on errors in the admission of evidence, and other errors, not here material.

2. The record here discloses (as set forth in full in the Appendix) no reason exists to believe the witness Benton would

was charged with a conspiracy to corruptly endeavor to influence and impede the due administration of justice, because Rasmussen's claim was alleged to have been made, "apparently, but not really, for his personal protection, and * * * [was] for the purpose of corruptly giving shelter, behind the said privilege, to the said J. H. Madden and the said Hans Strittmatter, under the pretext of shielding the said witness Rasmussen." (Id. 28 F.2d at 122.)

This case, of course, is not binding on this court, and we refuse to follow it for reasons heretofore stated.

We need not discuss the additional cases plaintiff cites that hold that a witness' motives for exercising his privilege are immaterial. We agree with them, on their facts. United States v. Courtney, 2 Cir. 1956, 236 F.2d 921. But see Judge Lumbard's dissent in United States v. Courtney, as well as his concurrence in United States v. Gordon, 2 Cir. 1956, 236 F.2d 916 (which is "to be read together" with the first Courtney case mentioned), and his reference to Judge Learned Hand's language in United States v. St. Pierre, 2 Cir. 1942, 132 F.2d 837, 840, 147 A.L.R. 240, that while the privilege of refusing to answer expresses recognition of the high value our democracy puts on the individual's right of privacy:

> "The result of using this, like any other privilege, is to deprive people of evidence which would be otherwise available; at best a disastrous necessity * * *." (Id. 132 F.2d at 840.)

Implicit in such reasoning is the requirement that there are needs on both sides of the privilege—one requiring its extension and one requiring its contraction. We here, in a case of apparent first impression, do not think it wise to render a valuable, proper and decent privilege a carte blanche license to be utilized "to influence, obstruct or impede"—not justice—but "the due administration of justice."

After oral argument, appellant's counsel submitted a letter (to which we permitted the government to reply) urging upon us (1) that the "jury * * * could not properly find that Cole's advice was given [to Benton] for some ulterior or self-serving motive, because no such question was submitted to the jury." (2) "The record does not show that Cole had any reason to want to protect himself, or that Benton knew anything that Cole did not want him to testify to."

(1) Admittedly, the prosecution's theories (a) of Cole's threats, (b) his advice to Benton to leave town, and (c) that the obstruction of due administration of justice took place by advice which was "unlawful if Cole went over the 'imaginary line' between asking Benton to take the Fifth, and 'insisting' or 'imploring' or 'demanding' that he do so," were all submitted to the jury. Nor can we agree that the jury was not instructed on Cole's motive. A reading of 18 U.S.C. § 1503 limits the acts proscribed to those done with a "corrupt" motive. The court instructed in the language of the statute, and emphasized that only *corrupt* methods were prohibited; that *corrupt* influence was the only influence proscribed;—that only "any act, committed *corruptly,*" was to be considered. (Tr. pp. 920–922.) The court thoroughly instructed on the "specific intent" necessary to be found in a case such as this. (Tr. p. 918.)

(2) Nor is the record bare of evidence "of any reason" why Cole would want Benton not to testify. An inference could be drawn that Cole remembered both the statements that he had made to government agents and to the grand jury under oath, and the contradictory statements he had made to Benton as testified to by Benton at trial. The Cole statement to Benton that Stacher was the

---

have incriminated himself had he answered the questions asked. They were but two in number: (1) "Were you ever an employee of Cole, Fischer & Rogow?" and (2) "Have you ever seen an individual named Joseph Stacher?" There is no showing the answer to either of these questions bore any relation to the Stein payments; or would otherwise incriminate Benton.

"number two man" in the syndicate, and he, Cole, was "Stacher's boy," is at variance with Cole's statement that his relationship with Stacher was purely a social one engendered by a friendship between their wives by reason of a "P.T.A. meeting;" and that there was no business relationship between the two men.

Further, Cole gave instructions to others, including his maid, to likewise claim the Fifth Amendment privilege before the grand jury. He influenced W. Jack Bernard and W. Levin to take the Fifth Amendment in other matters. He himself left town when the Attorney General of the United States was in town. He kept himself informed, at least after Benton's first appearance before the grand jury, as to when the grand jury was meeting and what, so he thought, the government "was interested in." We need not, and the jury did not need to know *why* Cole was interested in what the jury investigated, nor what it was he did not want brought up or testified about, nor need there be direct word of mouth testimony on these subjects. Inferences could well have been legitimately drawn by the jury that Cole wanted to keep the jury as far away as possible from any investigation of *any* relationship between Stacher and Cole.

### III—CONCLUSION

We hold the constitutional privilege against self-incrimination is an integral part of the due administration of justice, designed to do and further justice, and to the exercise of which there is an absolute right in every witness. A witness violates no duty to claim it, but one who bribes, coerces, forces or threatens a witness to claim it, or advises with corrupt motive the witness to take it, can and does himself obstruct or influence the due administration of justice.

We hold there here existed evidence from which the trier of facts, the jury, could conclude such an obstruction of the due administration of justice had taken place, and that appellant had, corruptly, and by influence and threats and consideration paid, caused it. Affirmed.

*Appendix A*

*Statement of Facts*

"During the spring of 1962, a Federal Grand Jury, sitting in Los Angeles, was engaged in the investigation of [one] Joseph 'Doc' Stacher, against whom deportation proceedings had previously been instituted, in an endeavor to determine whether he had obtained a secret interest in the Casino of the Sands Hotel, Las Vegas, Nevada [R.T. 135–136; 486–487; 560]. [n. 1, which we omit.]

"The Appellant Marvin R. Cole [n. 2, which we omit], a friend and associate of Mr. Stacher's was subpoenaed to appear on April 26, 1963, before the Stacher Grand Jury [R.T. 212–223; 478–479; 486–487; 499; 564]. Prior to his appearance, Cole, the head of the advertising agency of Cole, Fischer & Rogow, Inc., and the advertising man for the Sands Hotel since 1953 [R.T. 502–505], had been interviewed on a number of occasions by agents of the Federal Bureau of Investigation in an effort to determine what Cole knew of Stacher's activities, and what was the nature of their association [R.T. 93, 487]. In answer to the agents' questions, Cole stated:

" '* * * I know him socially. His wife and my wife are very good friends, they belong to the same PTA. Occasionally I see him through that conection. That's all I know about him. I never had any dealings with him, any business dealings or association.' [R.T. 487.]

"During his Grand Jury appearance on April 26, 1962, Cole was asked the same questions, and it is apparent from his discussion with his attorney, immediately preceding and subsequent to his appearance, that he gave the same answers [R. T. 487; 498].

"Subsequently, a Grand Jury commenced investigating Cole for possible perjury during his testimony before the Stacher Grand Jury [137–138].

"The investigation of Stacher continued through June 7, 1962 [R.T. 136]. In May 1962, the United States Attorney's Office contacted the witness Joel

Benton by telephone to arrange for his Grand Jury appearance on June 7, 1962. Benton was informed that he personally was not the subject of the Grand Jury investigation. Benton then indicated that he would testify, and no subpoena would be necessary to obtain his attendance [R.T. 148–151; 433]. When Benton finished this conversation, he phoned Marvin Cole and told him what had just taken place. Cole said he would pick Benton up for lunch, so they could discuss the situation [R.T. 150–151].

"The reason that Benton phoned Cole was that, for a number of years, he had been under Cole's instruction that Cole was to be notified whenever agents or officers of the Government contacted Benton.

"Though Cole and Benton were not friends as such, and had not seen each other for a long time prior to Benton's call [R.T. 281; 378; 515; 573–574], they were acquainted because Cole had employed Benton as a copy writer and an account executive from the time Cole, Fischer & Rogow, Inc. opened in the Sands Reservation Office in late 1954, until June 1957, when a court order put a major client out of business [R.T. 142–143; 373; 506; 512]. During that period Benton had seen Stacher in Cole's private office on a number of occasions—usually on Saturdays [R.T. 213], and Cole made a number of remarks to Benton that sharply conflicted with the statements he later gave to agents of the Fed-

eral Bureau of Investigation [R.T. 212–223]. On the first occasion that Benton saw Stacher in Cole's office, Cole introduced Benton to Stacher, and then, later asked Benton if he knew who Stacher was. When Benton said he didn't, Cole told him that Stacher was the 'No. 2 man' in the 'syndicate' and that he, Cole, was Stacher's 'boy.' [R.T. 217.] * * *

"On the same day that he received Benton's phone call, Cole and Irving Reiss, a former investigator for the New York Liquor Authority who became a business associate and a close friend of Cole [R.T. 45–49; 88–89], picked up Benton and drove to the Bantam Cock Restaurant on LaCienega Boulevard in Los Angeles [R.T. 151–153].

"Once there, Cole informed Benton that he, Benton, had to take the Fifth Amendment [R.T. 153–154; 181]. Benton was reluctant to do so because of his job [R.T. 154]. Cole argued 'There is nothing to worry about on that score. Besides that, you know they have that other thing hanging over your head' [R.T. 154]. That 'other thing' was the Nate Stein matter [3] [R.T. 155–156].

"Benton then expressed a desire to call an attorney named Marshall Sevin for legal representation. Cole * * * [felt Benton should] use one of Cole's attorneys which he would arrange for; but Benton preferred to consult an attorney of his own [R.T. 154–155]. Cole acquiesced, but then * * * [told] Benton to keep Sevin uninformed concerning

"3. The Nate Stein matter was a club that Cole raised over Benton's head every time there was an indication that Benton might testify before the Grand Jury [R.T. 154; 191; 246–247; 271–272; 432]. In its simplest form, the Nate Stein matter concerned a false affidavit that Benton had submitted to the United States Senate Committee on Improper Activities in the Labor Management Field (the McClellan Committee) on behalf of Nate Stein. In that affidavit Benton attested to the fact that he had received certain checks from the Teamsters Union for performing a truck survey for that Union, and he had shared the money with no one [R.T. 161–163; 168–169]. The affidavit was false [R.T. 156]. In fact, Stein brought four checks to Benton which were made out in

Benton's name. Benton endorsed the checks, and turned them over to Stein. Benton had performed no survey and received no money from the checks [R.T. 155–158; 163; 166]. At the time that Benton submitted the false affidavit to the McClellan Committee, he showed it to Marvin Cole because, even though he knew Stein and Cole disliked each other, he believed that they were associated together in some manner not involving the advertising agency [R.T. 175].

"It would be proper for this Court to take judicial notice of the fact that on August 12, 1963 Stein filed a notice of apppeal in this circuit, from his conviction for obstructing justice by inducing Joel Benton to submit the false affidavit on his behalf."

the details surrounding his appearance before the Grand Jury, urging that Sevin was to be retained merely to 'hold [Benton's] hand' in case something should occur during the Grand Jury appearance [R.T. 177]. Benton then called Sevin and made an appointment for the following afternoon [R.T. 177–178].

"On the day following the first meeting at the Bantam Cock Restaurant, the second meeting [n. 4, which we omit] took place between Cole and his friend Reiss on the one hand, and Benton on the other. This second meeting * * * was held a few hours prior to Benton's conference with Marshall Sevin * * *. Again Cole and his companion Reiss picked Benton up at his office and drove him to the Bantam Cock. Again Cole informed Benton that he must take the Fifth Amendment. And again Cole urged Benton to keep his attorney, Marshall Sevin, uninformed [R.T. 179–181].

"When lunch was finished, Cole and Reiss drove Benton to Marshall Sevin's office and left him there [R.T. 186]. Benton was a very frightened man when he entered his attorney's office [R.T. 194; 440]. 'His hands were shaking, his manner and appearance were one of great nervousness' [R.T. 429]. Benton was well aware of Cole's association with Stacher [R.T. 212–223]. * * * [T]hree weeks later * * * he came to the Government and asked for physical protection for his family and himself [R.T. 396; 401].

"The conversation between Benton and Sevin took something over half an hour, [R.T. 445] and was interrupted near the end by Cole who phoned into the office to find out why the conference wasn't finished [n. 5, which we omit]. Benton and Sevin went downstairs where Sevin entered Cole's car * * *. [R.T. 188–189]. Sevin told Cole that he didn't want Benton to take the Fifth Amendment [R. T. 190; 431]. Cole * * * [said]: 'No, he has got to take the Fifth Amendment' [R.T. 190]. He repeated this two or three times [R.T. 191], and then said they have something on him that would lead to an investigation [R.T. 191; 431].

Cole was referring to the Stein matter [R.T. 527]. In fact, but unbeknownst to Cole, * * * Sevin [knew] about the false affidavit [R.T. 437–438], and Sevin said that he saw no necessity for Benton's pleading the Fifth Amendment [R. T. 431].

" 'Mr. Cole again insisted that Benton take the Fifth Amendment. * * *' [R.T. 432; 436.]

" 'He got white around the mouth, Marvin Cole got white around the mouth, his eyes looked—his eyes changed in their appearance and his voice rose from a conventional tone, it became louder, it rose in pitch and became louder.

" '* * * He appeared to be worn. He appeared to be in a state of upset. He appeared to be very emotional about this, very tense, very excited. * * *

" 'His manner of speaking was not that of a person merely making suggestions or giving advice * * * his statements were not * * * in the form of questions as much as they were a manner of a demanding nature, they were urgent insistence. * * *' [R.T. 191–192; 434–436].

"Marshall Sevin suddenly changed his position and told Benton that he should take the Fifth Amendment. In truth, Sevin received no new information from Cole and never changed his mind about the course that Benton should follow, but after being in the car with Cole, he verbalized an opinion that he did not really hold [R.T. 438–439].

"At that point Mr. Sevin advised Benton to leave the car and call the United States Attorney's Office to request a subpoena for June 7, 1962, since he had previously indicated that he was going to testify and was now not going to do so [R.T. 433].

"On June 7, 1962, Benton appeared and took the Fifth Amendment to the following questions:

" 'Q. Sir, will you please state your full name? A. Joel Robert Benton. Q. What is your business

address? A. 9060 Santa Monica Boulevard. Q. Is that known as Space and Time, Inc.? A. Known as Space and Time Advertising, Inc. Q. Advertising, thank you. Were you ever an employee of a firm known as Cole, Fischer & Rogow? A. I claim the privilege given me by the Constitution of the United States, that I not be compelled to testify against myself. I therefore respectfully decline to answer the same question.

" 'Q. Mr. Benton, have you ever seen an individual named Joseph Stacher? A. I claim the privilege given me by the Constitution of the United States, that I not be compelled to testify against myself. I therefore respectfully decline to answer the question.

" 'Q. Mr. Benton, is it your feeling that any question this Grand Jury might ask might have the tendency to incriminate you so that you will resort to the privilege? A. Again, I claim the privilege given me by the Constitution of the United States, that I not be compelled to testify against myself. I therefore respectfully decline to answer the question.

" 'Mr. Farber: Thank you, Mr. Benton. That's all.' [R.T. 136–137.]

"Benton pleaded the Fifth Amendment solely because of the insistence of Marvin Cole that he do so [n. 6, which we omit], [if Sevin is to be believed]. [R.T. 226.]

"Upon concluding his Grand Jury appearance, Benton left the Federal Building and drove directly to Frascati's Grill on Sunset Boulevard in Los Angeles. From there, pursuant to earlier instructions from Cole, he phoned him [R.T. 227–228]. A few minutes later Cole and * * * Reiss arrived. Cole [asked] * * * Benton concerning the questions asked of him by the Grand Jury [R.T. 228]. When Benton mentioned that his attorney, Mr. Sevin had conversed with an Assistant United States Attorney but that he didn't know what was the topic of conversation, Cole directed Benton to phone his attorney, Mr. Sevin, and determine what had been discussed. Benton did as he was told and reported back that the conversation was merely 'lawyer talk' [R.T. 228–230]. During the same meeting Cole maintained that he wanted to pay the attorney's fee incurred by Benton [R.T. 230], which he did a few days later by giving Benton a $100 bill [R.T. 265].

"It was ten days, or two weeks, after the meeting at Frascati's that Cole phoned Benton and informed him that he, Cole, and the 'boys' were getting out of Los Angeles for the duration of Attorney General Robert Kennedy's visit which was scheduled for the following week. [N. 7: ' * * * [T]he Attorney General did come to Los Angeles during the week of June 26, 1962, and Marvin Cole did leave and go to New York for that week [R.T. 607–608].'] He suggested that Benton also, ' * * * Take a little run out of town. * * *' [n. 8, which we omit] [R.T. 232.]

"On June 21, 1962, only two weeks after his Grand Jury appearance, Benton contacted the United States Attorney's Office, voluntarily came to the Federal Building and gave a sworn statement, part of which concerned the false affidavit submitted on behalf of Nate Stein [R.T. 396–397]. It was at this time that, as mentioned above, Benton requested protection be given his family and himself. He requested nothing else of the Government and nothing was promised [R.T. 401].

"There was no contact by telephone, or otherwise, between Cole and Benton from the middle of June 1962 until October 9, 1962 [R.T. 398–399; 574]. On the latter date Benton, who was working with the Government, called Cole, under Governmental instructions, to inform him that he had been subpoenaed again. This time for October 18, 1962 [R.T. 240–241; 244; 251]. During the talk, Benton told Cole that he didn't want to

plead the Fifth Amendment because of his job. Cole answered that the Grand Jury wasn't about him, but about Nate Stein. Then Cole suggested that he meet Benton for lunch. * * * [T]he discussions produced nothing inculpatory on Cole's part. But in that conversation * * * *Cole* * * * asserted that the Grand Jury was investigating Benton and the Stein matter, * * * [and] recommended that Benton *not* call his attorney, Marshall Sevin, until after Cole and Benton had met [9] [R.T. 243–249].

"On October 10, 1962, Cole again in the company of Mr. Reiss, picked up Benton at his office [R.T. 252–253].

"When they had entered the restaurant, Marvin R. Cole started the conversation by demanding to know where Benton had gotten ' * * * such a silly idea as not to go down and take the Fifth * * *' He told Benton it was very foolish, that he ' * * * should go down, must go down and take the Fifth' [R.T. 253].

"Benton answered that he didn't wish to [R.T. 253].

"Cole wondered to whom Benton had been listening [R.T. 253].

"Benton said his wife and brother [R.T. 253].

"Cole wanted to know what qualified them to give Benton advice [R.T. 253]. He argued that Benton was a 'stand-up guy', and wouldn't get in any trouble if he kept his mouth shut.

" ' * * * "Everybody is taking the Fifth Amendment," * * * "You think you have been under a little pressure." * * * "Everybody in my office, they have had down there to testify. They have all taken the Fifth." "Even the maid in my home, * * *." ' [R.T. 260].

"He went on to inform Benton just how stupid he was to go down and tell the Grand Jury anything [R.T. 261]. He then told Benton of other witnesses that he had tampered with [R.T. 261].

" 'He pointed out that other people had had that idea and that fortunately he had been able to talk them out of it. He mentioned two cases in particular. One was Jack Bernard, head of Foods, Plus, and the other was Jack Lewin, formerly president of Trans American Airlines. He told me that both of these men, and he said, "They are both important, as you know, big men," he said, "as a matter of fact, Jack Bernard was very indignant when we suggested to him that he take the Fifth Amendment. He wanted to answer certain questions, even though there were certain other questions which he did not want to answer, but he did definitely want to answer certain questions."

" 'He said also that the Government had expected that when Jack Lewin testified, that he would say definitely that Marvin Cole, that he knew that Marvin Cole had an undisclosed interest in the Sands Hotel, and that is what the Government expected Jack Lewin would testify to.

" 'But Marvin said that after they talked with his, Marvin's attorney, they changed their mind on it, and Jack Lewin did not answer questions —I mean Jack Bernard did not answer questions as the Government expected he would answer, and Jack Lewin, instead of saying definitely that Marvin Cole did have an undisclosed interest in the Sands Hotel, changed it to say that he had heard that Marvin Cole did have an undisclosed interest in the Sands Hotel.

" 'Marvin Cole also mentioned a check which came about this same time, a check as I recall that he had

"9. When they did meet the next day, Cole attempted to dissuade Benton from consulting Sevin entirely. He insisted that Benton needed a 'heavyweight'—like Paul Ziffren, one of Cole's attorneys. When it was pointed out that Benton couldn't afford such an attorney, Cole said he would assume the cost if Benton would go see Ziffren [R.T. 263–264]."

given to Eddie Torres, or that Eddie Torres had given to him, I don't recall which it was, but there was a $25,000 check, and the testimony on that was not forthcoming from either Jack Bernard or Jack Lewin, so nothing happened on that. He said that both Jack Lewin and Jack Bernard were mighty happy that they did not answer the questions put to them at the time they were to testify' [R.T. 261–263].

"The entire meeting between Cole, his friend Reiss, and Benton took close to two hours [R.T. 638, 640]. Towards the end of the conversation, Benton protested that he didn't know what to do. Cole informed Benton he had already told him what to do, and in conclusion, in a loud, excited tone of voice, he threatened, 'Now, don't forget this Joel * * * if you do testify, you will lose your job.' He mentioned Harry Karl's name and then promised, 'I will see to it that if you do take the Fifth, you do not lose your job' [R.T. 632–633].

"During the whole meeting Benton was wearing a concealed radio transmitter which was broadcasting to a receiver and a tape recorder under the control of Special Agent Hal Rassi [R.T. 252, 623–624]. Because the tape was in large part unintelligible, it was not played for the jury [R.T. 59–63, 625–638]. But at the time Marvin Cole and Irving Reiss testified they knew the tape's failings, because they had previously heard it played [R.T. 34–35]. On the other hand, Benton, when he took the stand, knew only that he had worn 'a radio transmitter' and recording had been made, but he did not know the contents of the tape or that it was unintelligible [R.T. 139–140, 273].

"The final meeting between Cole, Reiss and Benton took place in the parking lot behind Benton's office building on October 17, 1962, the day before Benton's scheduled Grand Jury appearance [R.T. 269–270; 574]. It took place, at Cole's insistence, after the following events transpired [R.T. 270]; Subsequent to the meeting at the Bantam Cock on October 10, 1962, Cole, with Benton's reluctant approval, had phoned Ziffren to set up an appointment for Benton. Cole then phoned Benton to tell him of the appointment. During this conversation Benton told Cole that he wouldn't need Ziffren because he was definitely going to testify. Cole then requested that Benton call Ziffren and cancel the appointment, which Benton did [R.T. 263–264; 268–269]. Later Cole placed an urgent call to Benton to arrange a meeting, asserting that it was important for him to talk to Benton, and suggesting that they go for lunch. [n. 10, which we omit.] Benton agreed, but later changed the meeting place to the parking lot behind his building [R.T. 270] because agents of the Federal Bureau of Investigation did not want him taking a ride with Cole [R.T. 413]. At approximately 12:30 P. M. Irving Reiss drove up with Cole sitting beside him [R.T. 270; 549]. Cole began the conversation by thanking Benton for calling Paul Ziffren and cancelling an appointment [R.T. 271].

"Then, after displaying a subpoena issued to Irving Reiss and telling Benton that he would have company before the Grand Jury, Cole argued that Benton was very foolish to testify. Finally, he urged Benton to get in touch with Nate Stein. Benton answered that Stein had been in Benton's office a few days before. Cole exclaimed that Stein was a damn fool for coming to Benton's office, but that he ought to see him. He then warned Benton, 'Joel, even if you don't care about what happens to yourself, remember this, you have got a lovely wife and family, and * * * you wouldn't want anything to happen to them, would you?' He added, 'Well, remember, Jimmie Hoffa's boys are mighty rough * * * I highly recommend you get in touch with Nate Stein right away.' He told Benton that Stein could be reached through May Skinner at the Sands Hotel office and, if not, for Benton to recontact him, Cole [R.T. 271–272].

"The next day, October 18, 1962, Cole was indicted by a Federal Grand Jury

for obstructing and attempting to obstruct the due administration of justice [C.T. 2].

"Cole's defense at his trial was that Benton had a problem and all he, Cole, did was give Benton friendly advice [R. T. 33–108; 501–600; 763–866]."