**UNITED STATES of America,
Plaintiff,**

v.

**Marvin R. COLE, Arthur A. Fischer and Cole Fischer Rogow, Inc., Defendants.**

**No. 69 CR. 827.**

United States District Court,
S. D. New York.

April 14, 1971.

Whitney North Seymour, Jr., U. S. Atty., S. D. N. Y., by Edward M. Shaw, Asst. U. S. Atty., of counsel.

Millard & Greene, New York City, for defendants; by Myron Greene, and Stanley P. Gimbel, New York City, of counsel.

POLLACK, District Judge.

The defendants seek to void a prosecution against them for criminal tax evasion on the ground that the government's proceedings and proof were tainted by illegal electronic surveillance.

### I.

In 1961–62, the Department of Justice was conducting a grand jury investigation of Joseph "Doc" Stacher under an organized crime drive (OCD). The investigation was directed primarily to whether Stacher owned certain interests in gambling casinos in Las Vegas.

On or about May 5, 1961 until August 29, 1962, an electronic transmitting device was illegally planted and used by agents of the Federal Bureau of Investigation to overhear conversations in the private business office of the defendant Cole, located in Beverly Hills, California. In November, 1962, until about April 28, 1963, a similar device was illegally planted and utilized by the FBI in the Fremont Hotel in Las Vegas, Nevada, a

hotel in which the defendant Cole then had a proprietary interest.

It was believed that the defendant Cole was a deputy for an unreported, undisclosed interest held by Stacher in gambling at the Sands Hotel in Las Vegas. Cole's advertising agency, the defendant Cole, Fischer & Rogow, Inc., with offices in New York City and Beverly Hills, represented the Sands Hotel. Cole and defendant Fischer were each 50% stockholders of the advertising agency.

Cole was called before the grand jury investigating Stacher, in April, 1962 and questioned in relation to any association he had with Stacher. In substance he denied even knowing Stacher, except only superficially. On June 21, 1962, one Joel Benton, a former employee of the corporate defendant, sought out representatives of the FBI through his brother. He sent his brother to meet the agents and made known his desire to come in to give a statement to the government concerning Cole and his connection with the gambling interests. Benton then met with Benjamin Farber, an assistant in the office of the United States Attorney, and gave him a voluntary statement indicating among other things, Cole's connections with Stacher; the skimming off of gambling money which was not declared as income on the books of the Sands Hotel; the use of Cole's office to receive such moneys in cash for distribution and a financial interest of Cole in the Sands Hotel as well as in the Fremont Hotel.

In the summer of 1962 a second grand jury was convened following Farber's talk with Benton; it inquired into whether Cole had committed perjury before the Stacher grand jury. In the late summer of 1962 or early fall, Farber talked to one, Louis Scalzo, a. Department of Justice lawyer concerning the opening of an Internal Revenue Service (IRS hereafter) investigation of Cole. Farber's request was based in large part on the information from Benton that Cole was acting as the representative of Stacher's hidden interest and also that

Cole himself held a hidden interest in gambling tables and the unreported proceeds therefrom.

In October 1962, Cole was indicted on a charge of obstructing justice in regard to the Stacher investigation and in the Cole investigation. That indictment grew out of alleged coercion exerted by Cole to keep Benton from testifying before the grand jury. Cole was tried and found guilty by a jury and the conviction was affirmed on appeal. Cole v. United States, 329 F.2d 437 (9th Cir. 1964), cert. denied, 377 U.S. 954, 84 S. Ct. 1630, 12 L.Ed.2d 497 (1964).

In the fall of 1962, Farber told Francis S. Sullivan, an IRS agent assigned to investigate Cole's income tax matters that nothing should be done on the tax case for the time being because of the pending obstruction of justice charge against Cole. Farber did not want any collateral type investigation to impede that prosecution. Sullivan was preoccupied at the time with the Stacher case and at any event, was not able to work on the Cole assignment.

Neither Farber nor Sullivan had any knowledge of the illegal surveillance of Cole's office which had been conducted by the FBI.

Stacher was indicted in 1964.

Sullivan turned his attention to the FBI reports on Cole in October, November and December, 1963 but the investigation of Cole's tax matters was held in abeyance until May or June of 1964 by which time the obstruction of justice case had been completed as far as he was concerned.

The FBI reports indicated to Sullivan that Cole was charging personal expenses to the defendant corporation. Sullivan also had information concerning Cole's net worth in November, 1963 which was secured from an FBI report including financial statements submitted by Cole to bankers. As a result of Sullivan's analysis of the information at hand and the FBI reports, he informed his superior that he did not believe there was an intelligence case on the facts

contained in the reports; and at best it would be marginal, he thought. Sullivan wanted to know if the Department of Justice still wanted the case investigated. After an interval, the local office was told to go forward and conduct an investigation of the so-called saturation type, to leave no stone unturned in determining the correct tax liability of the taxpayer, if any.

Accordingly, Sullivan prepared a work plan of the Cole investigation, listing the areas of inquiry he felt were necessary under the procedures of an Organized Crime Drive case. In October, 1964 Sullivan communicated with Cole and told him he was making an investigation of his income tax affairs for the taxable years 1959 through 1962 and that he desired Cole's records and the Cole, Fischer & Rogow income tax returns and records. He told Cole that there was an unaccounted for increase in his net worth and an allegation of personal expenses charged by him to the corporation. Cole's lawyers were told about the same thing by Sullivan.

An effort was made by IRS to begin the examination of the corporate books and a subpoena was served to obtain the records. However, resistance was encountered from the taxpayers. Legal proceedings in respect of the production of the records occasioned a considerable delay. When the government's right to the production of the records was finally cleared, the IRS was, for the first time, informed that all corporate records prior to 1963 had been destroyed.

With the mandate from the Department of Justice, the IRS went forward with an investigation in respect of Cole's tax matters which began on June 8, 1965 in New York City. Agent Robert E. Zagorin had received an assignment to cooperate with Agent Sullivan. The latter continued on the case briefly. He was asked to remain alert to see if the government could develop a charge of conspiracy to obstruct justice by the destruction of the books and records of the corporate defendant. The investigation was taken over by Zagorin who truly conducted a saturation type investigation in every sense of the word, from June 8 through August 27, 1965. Zagorin was not assigned to audit the tax liability of the corporation; there was another agent who did that at a later time. Zagorin never read any of the FBI reports on Joseph Stacher or any of the files of the Intelligence Division containing any notes from any FBI reports. He never knew of any illegal surveillance of Cole. Zagorin's inquiry in 1965 was supplemented over the following years 1966, 1967 and 1968.

After the fall of 1965, with the information developed by Zagorin, a formal income tax investigation was opened pertaining to the defendant Fischer and the defendant corporation, Cole, Fischer & Rogow, Inc. This was handled by three other agents. None of the agents had ever read the surveillance logs of the "bugging" of Cole's office or knew thereof.

The indictment herein was filed on November 24, 1969 and charged the defendants with conspiracy to evade the corporation's and Cole's income taxes. In addition, the substantive offenses charged were tax evasion by Cole of income taxes for 1963 and 1964; tax evasion by the corporate defendant of income taxes for 1963 and 1964; and perjury by Fischer in signing the corporate returns for 1963 and 1964.

The case against the defendants herein went to trial on January 4, 1971. Prior thereto, the defendants had moved pursuant to Rule 41(e) of the Federal Rules of Criminal Procedure to suppress so much of the government's proof as this Court should determine, after a hearing, was obtained as a result of illegal eavesdropping. The moving papers claimed that the conversations which were overheard and recorded in 1961–62 included many dealing with Cole's financial transactions and tax practices, particularly his propensity for charging off personal expenses to the corporate defendant's income and unexplained increases in Cole's net worth. Stacher was so often mentioned by Cole in the

overheard conversations that, according to the moving papers, there was a strong possibility that the tax prosecution in this District [the tax returns of the defendants were filed in this District] was a direct result of the illegally obtained confirmation of the government's suspicions. The defendants asked for an adversary hearing before trial to determine the issue of taint.

The government did not oppose the defendant Cole's application for a hearing on the question of taint but contended that the hearing should be held post-trial. It contended that even if Cole's motion were successful, the case would have to proceed against the co-defendant Fischer who allegedly had no standing to complain of the unlawful eavesdropping of Cole. The government further pointed out that a suppression hearing might be protracted and might last many weeks if undertaken in advance of a trial and that it would be impossible to tell prior to trial exactly what proof the government would use either in cross-examining defense witnesses, or in its rebuttal case, or in its proof of similar acts. It argued that therefore the question of taint to be tried at a hearing could not be fully or reasonably determined until after trial.

While agreeing that a sensible rule in this case would permit the Court to hold a hearing at a later stage of the case, the defendants were concerned that the Court has no such discretion under Rule 41(e). They construed the Rule to require that the hearing should take place before the trial or during the trial but not afterwards. *But cf.* United States v. Birrell, 269 F.Supp. 716 (S.D.N.Y. 1967) (Herlands, J.); Alderman v. United States, 394 U.S. 165, 180, 89 S. Ct. 961, 22 L.Ed.2d 176 (1969); United States v. Salsbury, 430 F.2d 1045, 1051 (4th Cir. 1970).

They also contended that, as an officer of the corporation, the defendant Fischer had just as much standing as the defendant Cole and the corporation itself to suppress statements illegally obtained from Cole's premises in the corporate offices.

The motion under Rule 41(e) was denied without prejudice and subject to renewal after the trial or upon a showing of any extraordinary circumstances that defendants' counsel might present to support an earlier hearing. The motion to suppress was renewed at the outset of the trial and a hearing thereon was deferred until the government's proof was adduced.

The trial lasted for a period of two weeks and resulted in a jury verdict of guilty on each count of the indictment. Although prepared to do so, the Court did not proceed at once with the reserved hearing of the suppression motion. At the request of counsel for both sides and for their convenience, the suppression hearing was held some weeks later and lasted four days. Undoubtedly, with the benefit of the knowledge of the evidence actually used by the government, much time, effort and speculation were saved for the Court and counsel in contrast to the predicted lengthy hearing envisaged if conducted at an earlier stage of the prosecution. No date has as yet been fixed for sentence following the jury's verdict.

## II.

In a criminal trial, evidence seized in violation of a defendant's rights under the Fourth Amendment, must be rejected. The Constitution protects against the product of electronic surveillance, "bugging", by an uninvited ear.

The purpose of the exclusionary rule is to deter unconstitutional conduct. In Elkins v. United States, 364 U.S. 206, 217, 80 S.Ct. 1437, 1444, 4 L.Ed.2d 1669 (1960):

The rule is calculated to prevent, not to repair. Its purpose is to deter—to compel respect for the constitutional guaranty in the only effectively available way—by removing the incentive to disregard it.

■ The legal standard applicable here requires the government to prove beyond a reasonable doubt that the evidence used in the preceding trial was not obtained directly or indirectly from illegal surveillance.[1] Alderman v. United States, 394 U.S. 165, 183, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969); Wong Sun v. United States, 371 U.S. 471, 487–488, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); Nardone v. United States, 308 U.S. 338, 341, 60 S.Ct. 266, 84 L.Ed. 307 (1939); United States v. Schipani, 414 F.2d 1262, 1266 (2d Cir. 1969), cert. denied, 397 U.S. 922, 90 S.Ct. 902, 25 L.Ed.2d 102 (1970). Specifically, evidence discovered as a result of both legal and illegal leads is inadmissible even though the legal lead would itself probably have sufficed to uncover the evidence. United States v. Schipani, 414 F.2d 1262, 1266 (2d Cir. 1969), cert. denied, 397 U.S. 922, 90 S.Ct. 902, 25 L.Ed.2d 102 (1970). This does not make evidence inadmissible if it is discovered solely from legal leads even though illegal leads, if pursued, would have uncovered the same evidence. The question to be answered is whether the evidence used has been come at by exploitation of the illegality or instead by means sufficiently distinguishable to be purged of the primary taint. Maguire, Evidence of Guilt, 221 (1959).

■ Defendants contend, however, that not only must no trial evidence be uncovered as a direct or indirect result of an illegal search and seizure, but also the decision by the government to focus on, or intensify an already existing tax investigation of the defendants cannot stem from an illegal surveillance. As defendants apparently view the law, if the illegal electronic surveillance disclosed any sort of illegal activity, including a course of alleged tax evasion in the past, which spurred the government to begin a more intense investigation of the defendants, then the instant prosecution for income tax violations committed in periods *after* the illegal surveillance must fail. The defendants contend that they could not be prosecuted unless the government stumbled across information legally gathered that was adequate to and did in fact spur an investigation leading to a prosecution. This position is unsound and against precedent.

The underlying question was before the Court of Appeals in United States v. Nardone, 127 F.2d 521 (2d Cir.), cert. denied, 316 U.S. 698, 62 S.Ct. 1296, 86 L.Ed. 1767 (1942). Judge Learned Hand interpreted the issue as

> [W]hether a prosecution must show, not only that it has not used any information illicitly obtained, either as evidence, or as the means of procuring evidence; but that the information has not itself spurred the authorities to press an investigation which they might otherwise have dropped.

127 F.2d at 523.

The Court held that the prosecution need only prove that its illegal acts did not lead directly or indirectly to the discovery of any evidence used at trial to purge itself of unlawful conduct.

The defendants rely on United States v. Schipani, 289 F.Supp. 43 (E.D.N.Y. 1968), aff'd 414 F.2d 1262 (2d Cir. 1969), cert. denied, 397 U.S. 922, 90 S. Ct. 902, 25 L.Ed.2d 102 (1970). In that case Judge Weinstein held that if the government learns through illegal means that a person is closely connected with organized crime and then proceeds to launch an income tax investigation, the tax evasion prosecution must fail. 289 F.Supp. at 62. Defendants urge that this Court is bound by Schipani since the Court of Appeals "approve[d] the legal principles applied." 414 F.2d at 1266.

The question of whether Schipani binds the District Courts in this Circuit need not be reached since the instant prosecution could not be tainted even under the principle expressed in Schipani.

---

1. Since the result is not altered if the government need only prove by a preponderance of the evidence that no tainted evidence was used at trial, the "reasonable doubt" standard is assumed applicable.

As noted above, the illegal electronic surveillance in this case occurred prior to the years in which the defendants violated the federal income tax laws. By contrast, in *Schipani*, the income tax prosecution was for taxable years prior to or contemporaneous with the electronic surveillance. 289 F.Supp. at 45–46. There is no indication in the *Schipani* opinion that the case dealt with or intended to suggest that a taxpayer could obtain immunity for his future misconduct involving future taxable years because of a prior illegal surveillance.

While the government's breach of the defendants' constitutional right to be free of illegal searches and seizures is reprehensible, such illegality by the government does not fortuitously give the defendants a license to break the law thereafter with impunity. "[E]ternal damnation is not the ineluctable fate of the Government's case." United States v. Birrell, 269 F.Supp. 716, 725 (S.D.N.Y.1967) (Herlands, J.).

The position of the defendants is tantamount to saying that a tainted lead to a taxpayer whose conduct is suspect generally as that of a habitual tax evader, immunizes him from prosecution for tax evasion committed subsequent to an illegal eavesdrop, on a notion that the proof established by an ensuing investigation lasting several years is to be deemed procured or discovered by the prior unlawful conduct. The defendants thus say that, "The decision to focus and intensify upon the income tax affairs of Marvin Cole was clearly the result of violations of Mr. Cole's rights under the Fourth Amendment to the United States Constitution." The defendants would consequently have the Court conclude that the government must purge itself of the primary illegality and the fruits of a saturation investigation caused by illegal leads must be struck down.

The rule contended for by defendants would be tantamount to lifetime exoneration from tax accountability for future tax evasion in any general category of deductions or income touched upon

through an illegal surveillance. A rule of reason and common sense precludes such a far fetched consequence. Any such rule would "increase to an intolerable degree interference with the public interest in having the guilty brought to book". United States v. Blue, 384 U.S. 251, 255, 86 S.Ct. 1416, 16 L.Ed.2d 510 (1966) (Harlan, J.).

In the only reported decision with a similar factual background, the same result was reached as here:

> These logs have nothing whatsoever to do with the subject matter of this case resulting in Friedland's conviction. The time periods are two to three years earlier than the events which were the subject of this case; moreover, the subject matter is entirely different and unrelated. For these reasons alone, I conclude that the government has sustained its position on the wiretap issue beyond a reasonable doubt. United States v. Friedland, 316 F.Supp. 459, 461 (S.D.N.Y.1970) (Tyler, J.), aff'd, 441 F.2d 855 (2d Cir. 1971).

By definition, the illegal "bugs" in this case could not have picked up in 1961 and 1962 leads or other information dealing with violations of federal law in future tax years. As in *Friedland*, the subject matter of the surveillance is entirely different and unrelated to the acts for which the defendants have been prosecuted.

Unconstitutionally seized evidence is not excluded at trial because of the defendant's innocence. Rather, it represents a policy that only by doing so are the authorities given an adequate impetus to respect constitutional rights. Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961); Wolf v. Colorado, 338 U.S. 25, 43–44, 69 S.Ct. 1359, 93 L.Ed. 1782 (1949) (Murphy, J., dissenting).

The Court of Appeals has held in a recent phase of the *Schipani* litigation that where there is little deterrent effect in excluding evidence from a consideration, there is no benefit in excluding

it. United States v. Schipani, 435 F.2d 26, 28 (2d Cir. 1970), cert. denied, 401 U.S. ——, 91 S.Ct. 1198, 28 L.Ed.2d 334 (1971); see also United States ex rel. Sperling v. Fitzpatrick, 426 F.2d 1161 (2d Cir. 1970). The defendants would have the Court suppress all evidence discovered solely as a product of a legal investigation if the legal investigation was begun or intensified as a result of illegal activity. But the United States is surely right when it says that

> The danger that law enforcement agencies will conduct illegal electronic searches solely for the purpose of discovering speakers as worthy targets of investigation is * * * remote. Government's Post-hearing Memorandum at 5.

### III.

The government has established by credible evidence beyond a reasonable doubt that the proof used in the trial was free of any taint of illegality. The government's proofs were supported by credible witnesses, documents and the probabilities. Each of the items of proof used to establish the tax evasion, perjury and conspiracy was accounted for as to source. The information thereof appeared in the books, records, invoices and other documents of the defendant advertising agency and related to the taxable years 1963 and 1964. The proof was that there were other improper items that were ascertained in the investigation that were not used or established on the trial.

More particularly, the evidence established beyond reasonable doubt that the IRS investigation which culminated in the indictment of Cole was begun at the request of Assistant United States Attorney Farber, in October, 1962. Farber's request was based principally upon information given to him in person by Joel Benton on June 21, 1962. Benton came to Farber voluntarily. He had been interviewed four months previously by the FBI in connection with an investigation of Nat Stein and concerning a relationship of Benton with Stein. Benton was a former employee of Cole. After being questioned in the Stein matter, Benton, through his brother, volunteered to come in to see Farber.

Benton told Farber that during the time he was employed at Cole, Fischer & Rogow, he met a number of people at the office of the advertising agency connected with the Sands Hotel. Men from the hotel came with bundles of money on which there would be a little slip. The money would be tossed into a file cabinet. Cole told Benton that sometimes it was as much as "200,000 bucks", but "with our setup, we're not worried about having anybody steal it". Another time, on a Monday around noon, he said, a chap would come in with a black brief case, containing a flat pack of bills which was handed to Cole. The latter explained that this was the money stuffed into cans beneath the gambling tables—the gravy money that is never reported. Cole received a cut of these moneys which was not declared. Cole told Benton that he had 8⅔ points in the Sands Hotel; that this had been given to him by members of the family so that he could get into the Sands Hotel, since Cole didn't have any money and they had given him enough money so that he could buy into the Sands Hotel.

Benton's statement was stenographically recorded and runs over 70 pages of material typewritten in single space.

No such information had been procured directly or indirectly through the electronic surveillance of Cole prior to Benton's statement.

This information was untainted and it catalyzed the request to IRS of the desirability of investigating Cole's income taxability and returns. The government was not motivated to "focus" on the defendant Cole by tainted information—or to state it another way, there was no tainted decision to focus taxwise on the defendant Cole. Benton's information was sufficient by itself to make an IRS investigation on Cole reasonable, proper and advisable.

Much of the government's proof at trial was of personal items charged to the corporation. The proof of corporate payment of Cole's personal items as well as those of Fischer resulted from the review of corporate books and records in the "saturation" type investigation imposed here. The mere awareness that, in the taxable years 1961 and earlier, Cole had used the corporation to pay his personal expenses, bears no legal relationship to the investigation of the returns for the taxable years 1963 and 1964 on which the indictment was based. No attempt was made by the government to prove its case by prior similar acts or Cole's admissions thereof.

It is clear beyond doubt that none of the five IRS agents responsible for this tax case knew of or had read the surveillance logs of the illegal eavesdrops. Only Agent Sullivan had read the Cole FBI reports which mentioned that Cole was in the habit of charging his personal expenses to the advertising agency. An interview with a former secretary of the Cole agency yielded similar general information before this generalia had appeared in any surveillance log. Although Sullivan and Zagorin were aware of allegations of a general nature concerning corporate payment of personal expense, the 1963 and 1964 items proven at the trial were all uncovered as a direct result of IRS procedure for an Organized Crime Drive "saturation" type investigation.

The government's lead to Joel Benton was from a source independent of the illegal surveillance; the lead did not stem from anything or anyone's name obtained from the surveillance logs.

With the exception of a few scattered items related to the conspiracy count alone, none of which were identified on the surveillance logs, none of the trial evidence involved items affecting the income tax liability of the corporation for the fiscal years ended September 30, 1962 and prior thereto, nor to the income tax liability of the defendant Cole for the calendar years ended December 31, 1962 and prior thereto.

None of the relevant surveillance logs involved the corporate payments, omitted sales, overstated purchases or deductions for the fiscal years ending September 30, 1963 and thereafter.

None of the information in the surveillance logs provided any leads in respect of items relevant to the income tax returns or tax obligations of the defendants for the taxable years 1963 or 1964.

It is not material whether the Revenue Agents who were involved in the Cole investigation had any knowledge of the bugging. The protection afforded to the defendants does not depend upon knowledge of the illegal eavesdropping on the part of the government. Rather, it depends upon whether the information which forms the government's evidence of violation in fact was yielded by or resulted from the eavesdropping, irrespective of knowledge.

■ After the elimination of any stray item as to which the defendants might conceivably complain properly, there was still enough, indeed, overwhelming evidence remaining to sustain the verdict. United States v. Costello, 157 F.Supp. 461, 467 (S.D.N.Y.1957) (McGohey, J.), aff'd, 255 F.2d 876, 881 (2d Cir.), cert. denied, 357 U.S. 937, 78 S.Ct. 1385, 2 L.Ed.2d 1551 (1958). It is only if a substantial portion of the case against the defendants was a fruit of the poisonous tree, that a conviction may be overturned. Nardone v. United States, 308 U.S. 338, 341, 60 S.Ct. 266, 84 L.Ed. 307 (1939). Here, there was no such fruit or stated most favorably to defendants there was a miniscule and insubstantial amount of tainted fruit of such gossamer character as not to be readily identifiable. The significant evidence in this case was all of independent origin. There is no reasonable possibility that a substantial portion of the case is tainted.

The defendants' motions based on unlawful electronic surveillance are, in all respects, denied.

The foregoing shall constitute the Court's findings and conclusions as required by Rule 52(a), Fed.R.Civ.P.

A pre-sentence report will be ordered herein. The date fixed for sentence is June 14, 1971 at 10 A.M.

So ordered.