**UNITED STATES of America, Appellee,**

v.

**Marvin R. COLE et al., Defendants-Appellants.**

**Nos. 817–819, Dockets 72–1075 to 72–1077.**

United States Court of Appeals, Second Circuit.

Argued May 12, 1972.

Decided June 6, 1972.

Certiorari Denied Oct. 16, 1972. See 93 S.Ct. 238.

Edward M. Shaw, Asst. U. S. Atty. (Whitney North Seymour, Jr., U. S. Atty., for the Southern District of New York, Lawrence S. Feld, and John W. Nields, Jr., Asst. U. S. Attys., of counsel), for appellee.

Myron J. Greene, New York City (Peter H. Morrison, Charles A. Stillman, Benjamin Zelermyer, Julian W. Friedman, and Morrison, Paul Stillman & Beiley, New York City, of counsel), for defendants-appellants.

Before FRIENDLY, Chief Judge, and McGOWAN * and TIMBERS Circuit Judges.

FRIENDLY, Chief Judge:

After a hotly fought trial before Judge Pollack and a jury in the Southern District of New York, Cole, Fischer & Rogow, Inc., an advertising agency (CFR) with offices in New York, New York, and Beverly Hills, California, and Marvin R. Cole and Arthur S. Fischer, its sole stockholders and principal officers, were convicted on seven counts of an indictment. The first count charged all three defendants with conspiring in

---

* Of the United States Court of Appeals for the District of Columbia Circuit, sitting by designation.

violation of 18 U.S.C. § 371 to evade payment of their 1962–64 income taxes. Counts Two and Four charged all three defendants with evasion of CFR's taxes for 1963 and 1964 in violation of 26 U.S.C. § 7201. Counts Three and Five charged Fischer with signing false returns for the same years in violation of 26 U.S.C. § 7206(1). Counts Six and Seven charged Cole with evasion of his own taxes for 1963 and 1964 in violation of 18 U.S.C. § 7201.[1] The court sentenced Cole to one year concurrent prison terms and Fischer to three month concurrent terms on each of the five counts on which they were convicted, fined Cole $5,000 and Fischer $1,000 on each such count, and fined CFR $10,000 on each of Counts One, Two and Three.

Appellants challenge the convictions on three principal grounds: (1) that the evidence was insufficient to support the convictions; (2) that the Government should not have been allowed to introduce certain testimony at a trial of Cole before a federal court in California for obstructing justice and his conviction there, see Cole v. United States, 329 F.2d 437 (9 Cir.), cert. denied, 377 U.S. 954, 84 S.Ct. 1630, 12 L.Ed.2d 497 (1964), and that, in any event appellants' motion for a new trial should have been granted when the California conviction was set aside on *coram nobis* as having resulted in part from illegal bugging of Cole's office at CFR and various hotel and motel rooms that he used; and (3) that the decision to focus on the defendants' income tax evasion and evidence presented at the trial stemmed from the same illegal source.

### I.

Although we regard the attack on the sufficiency of the evidence as bordering on the frivolous, it is necessary for other purposes to state the facts and we can dispose of the argument in that context.

The gist of the Government's case was that Cole and Fischer had caused CFR to pay, and take deductions for, items that were personal in nature, thereby understating the income of CFR, Cole and Fischer. The largest item consisted of legal fees and expenses in connection with the proceeding against Cole in the federal court in California.[2] Although the defense contended that the conduct for which Cole was convicted—persuading Joel Benton, a former CFR employee, who had been called to testify before a grand jury, to claim the privilege against self-incrimination—was intended to protect the interests of some of CFR's hotel clients and thus, in the opinion of several lawyers, was properly chargeable to and deductible by CFR, the Government's position was that Cole's motives were either friendship for Benton, as he had unsuccessfully claimed in the California proceedings, see 329 F.2d at 449, or, more likely, a desire to prevent his own prosecution for making false statements of his lack of significant relations with one Joseph "Doc" Stacher, see 329 F.2d at 442–443. To show that the taking of deductions for these items was something more than a pardonable error, the Government presented evidence of the efforts to disguise it. The payments of Cole's legal bills in 1963 were recorded in CFR's books as legal expense payments in behalf of a CFR client, Candygram, Inc., and fees subsequently paid by Candygram for advertising services were treated as a reimbursement for these nonexistent Candygram expenses. Reuben Miller, CFR's outside accountant, testified that this had been done on the direction of Cole and Fischer. The defense countered with inconsistent statements of Miller and testimony by Fischer and two other witnesses, but the jury was entitled to credit Miller.

The other items alleged to have been illegally deducted were a large number of payments for what seemed on their face

---

1. Counts Eight and Nine, charging Fischer with the same crime, were severed on the Government's motion.

2. The facts developed in that prosecution are summarized in an appendix to the opinion affirming Cole's conviction, 329 F.2d at 443–449.

to be an outrageous pattern of expense account living. Joseph Bevacqua, a Manhattan tailor who had furnished custom-made clothes to Cole and Fischer for many years, was paid $150 twice monthly by CFR during 1963 and 1964, the payments being recorded as "T and E" (travel and entertainment). On CFR's 1963 return $3,665 in Bevacqua checks were deducted as a production expense. In December, 1964, after learning that IRS was reopening its examination of earlier years, Fischer told Miller to remove the $3,800 of Bevacqua checks from the T and E production account for that year and charge himself and Cole with an additional $1,900 of salary. No corresponding change was made for 1963. Cole and Fischer ordered custom-made Sulka ties tailored to their special lengths, and had the bills paid by CFR and charged to T and E. CFR paid and deducted numerous bills for airplane tickets for flights which, on their face, were by Cole's father and mother, Cole's wife and children, and Fischer's mother, none of which had any apparent business purpose. Although the defense claimed that the prosecution had not established beyond peradventure that the flights were actually taken by the persons named in the invoices or tickets and that Cole's father, a retired haberdasher, had rendered services by advising how to collect delinquent accounts and entertaining clients when Cole and Fischer were too busy, the jury was entitled to accept the Government's version. CFR paid for and charged to T and E roughly $530 for a "sweet sixteen" party for Cole's daughter at his Beverly Hills home in June 1963. In February 1964 it was Fischer's turn, on a larger scale. A Bar Mitzvah reception and dinner dance was held for his son at the Astor Hotel, one of CFR's clients, at a cost of $3,676.61. CFR issued a credit invoice offsetting an equivalent amount of Astor's indebtedness; Fischer did not reimburse the firm for this. Although appellants argue that

CFR was later forced to write-off certain bad debts from the Astor in excess of this bill and therefore CFR's taxable income was not understated by this transaction, Fischer's clearly was. A $275 dance music bill for the Bar Mitzvah dance was paid by CFR and charged and deducted as T and E. Similar treatment was afforded to bills for Cole's parents, wife and children at the Americana Hotel in Miami in the spring of 1963; for Fischer, his wife and two children at Grossinger's in the Catskills, from December 27, 1963 through January 1, 1964; and for three visits by Fischer and his wife (accompanied by two children on one occasion) to Kutcher's County Club in the Catskills in 1963 and 1964. While Fischer claimed his own stays had a business purpose, this, even if believed, did not authorize a deduction for his wife and children. Finally, CFR paid, charged to T and E, and deducted the bills of a Manhattan garage for a car which was delivered to Mrs. Fischer five days a week at her home at 10:30–11:30 a. m.,[3] and of a Beverly Hills garage for service on a car used by Mrs. Cole.[4]

■ Although appellants cast their argument mainly in terms of insufficiency of the evidence to warrant submission of the case to the jury, this is so plainly without merit that their real point must be another, which they mention in a lower key. This is an assertion that the judge submitted *some* items on which a finding of guilt would not be justified and therefore the entire edifice must fall since we cannot know how far these affected the verdict. The principle is sound enough in a proper case, see United States v. Guterma, 281 F.2d 742, 747–748 (2 Cir.), cert. denied, 364 U.S. 871, 81 S.Ct. 114, 5 L.Ed.2d 93 (1960), but we see no sufficient basis for applying it here. The essence of the charge was the payment of the legal fees, an issue which clearly was proper for submission, and a *pattern* of having CFR take deductions for personal expenses of

---

3. Once or twice a fortnight the car would be delivered at a Manhattan dress shop.

4. CFR also did this for a car used by Mr. Cole, which the Government did not challenge.

Cole and Fischer. The evidence of this was so overwhelming that no one could reasonably suppose the verdict would have been different even if one or two of the nearly twenty items should have been withheld from the jury—a question on which we thus need not pass. Although the government may not have proved every dollar of income alleged by the indictment to have been concealed, proof of some lesser amount will sustain a verdict if, as here, it remains material. *E. g.*, United States v. Burdick, 221 F.2d 932, 934 (3 Cir.), cert. denied, 350 U.S. 831, 76 S.Ct. 65, 100 L.Ed. 742 (1955).

## II.

The Government apparently had intended to make a prima facie case as to the nature of Cole's interest in the California criminal proceeding simply by offering the indictment,[5] and the Assistant United States Attorney in charge of the case indicated at pre-trial proceedings that he had no intention of proving Cole's conviction. The court having reserved ruling on the admissibility of the indictment, the prosecution called Joseph A. Ball, the Los Angeles attorney who had represented Cole at the trial. Its examination of Ball consisted only of establishing the amount he had received from CFR for legal services and the fact that he had never discussed their deductibility with Cole. Attracted by this opportunity to develop from Cole's own lawyer, on cross-examination, a version of the California proceeding favorable to the defendants, defense counsel sought to examine Ball concerning the contentions of the Government there. When the prosecutor objected and the judge sensibly inquired whether the California

trial record wouldn't constitute the best evidence of what the proceeding was about, defense counsel asserted that examination of the record would be an inferior method "when the issues and contentions can be briefly stated by experienced counsel who was in the case, better informed and better qualified to talk about it, and he can give us the answer so that he may be subject to any cross-examination Mr. Shaw [the Assistant United States Attorney] may see fit to make." After the court overruled the Government"s objection, Ball made an extended characterization of the California trial somewhat favorable to the defense theory in the New York trial. This included a statement that the contention of the Government was that the advice which Cole gave to Benton was motivated by a desire that Benton should "not advise the grand jury of things which he observed in the Cole, Fischer & Rogow office which pertained to visits from clients of theirs from the Fremont Hotel, the Sands, Mr. Stacher,| and so forth" and, further, over renewed objection, that Cole's "connection in this matter from beginning to end [was] one which arose out of his connection with" the business of CFR.

Faced with what he considered a tendentious characterization of the California trial, Mr. Shaw properly accepted defense counsel's invitation to cross-examine. He began by again offering the complete record of the California trial. The defense agreed to this, subject to the excision of any portions unrelated to its examination of Ball. In order to allow defense counsel an opportunity to examine the transcript, the judge temporarily allowed it to be marked for identification only.[6] Referring to Ball's

---

5. It is now settled that legal expenses incurred in the unsuccessful defense of a criminal charge may be deducted under I.R.C. § 162(a) if they are non-capital expenses which are "appropriate and helpful" for the "development of the [taxpayer's] business." Commissioner of Internal Revenue v. Tellier, 383 U.S. 687, 689, 86 S.Ct. 1118, 16 L.Ed.2d 185 (1966). In the context of this case,

the government had the burden of proving that Cole was motivated by personal reasons, rather than his interests in CFR, when he "suggested" that Benton plead the Fifth Amendment. The appellants do not object to the instructions on this point.

6. Later it was received, with certain excisions not here material.

characterization of Benton's testimony, the Government was allowed over objection to elicit Ball's recollection of testimony by Benton concerning remarks by Cole which is set forth in the margin.[7-8]

 Appellants' contention that the items summarized in note 7 constituted inadmissible hearsay is readily answered. Benton's testimony was offered not as proof that Cole in fact had made the declarations but as indicating the theory of the Government's case in California as shown by the testimony of its chief witness there. Appellants also contend that proof of Benton's statements violated the principle that admissible evidence should not be received if its probative value is outweighed by its prejudicial character. *Cf.* United States v. Deaton, 381 F.2d 114, 117 (2 Cir. 1967). The cases cited by appellants, where convictions have been reversed for violation of this principle, *e. g.*, United States v. Provoo, 215 F.2d 531, 534 (2 Cir. 1954), and Bloch v. United States, 221 F.2d 786, 790 (9 Cir. 1955), are more illuminating in their differences from what here occurred than in their similarities. The nature of the California proceeding was

central to the Government's case. Particularly after the defense had opened the door by developing what the Government reasonably considered a false description of the California trial, it was entitled to bring out the full story. It may be that, despite the prosecution's theory that the violent nature of Cole's alleged remarks was inconsistent with a business purpose, only the third of Benton's statements truly helped to discredit the claim that the defense of the California charge was related to CFR's business.[9] However, the first two were not highly inflammatory and the term "prejudicial" is misused in this context when applied to admissible evidence of high probative value on an essential element of the prosecution's case. See United States v. Briggs, 457 F.2d 908, 911 (2 Cir. 1972). Furthermore, since this portion of the transcript was ultimately received in evidence without objection, it is impossible to understand how permitting interrogation of Ball about parts of it can constitute reversible error.

The gambit of cross-examining Ball having thus been largely checked, defense counsel's next move was to elicit

7. (i) "Well, remember Jimmy Hoffa's boys are mighty rough. I highly recommend that you get in touch with Nate Stein right away."
The nature of the Nate Stein matter is explained in the appendix to the Ninth Circuit's opinion, 329 F.2d at 444 n. 3. In summary, Stein had arranged for Benton to submit a false affidavit to the Senate Committee on Improper Activities in the Labor Management Field that certain checks from the Teamsters Union constituted payment for a truck survey.
(ii) "Joel, even if you don't care about what happens to yourself, remember this, you have got a lovely wife and family. You wouldn't want want [sic] anything to happen to them, would you?"
(iii) Also, after eliciting Ball's recollection of Benton's statement that Cole had asked if he knew who Doc Stacher was, and his negative answer, the prosecution developed Benton's testimony that Cole had said "Well, Doc Stacher is the No. 2 man in the syndicate and I am his boy."

8. The prosecutor went on to elicit from Ball the testimony given by Cole in California that his advice to Benton was motivated solely by friendship and the absence of any suggestion by Cole or in Ball's own summation that Cole's action was motivated by CFR's business.

9. Stacher was not a client of CFR. Furthermore, Benton's testimony concerning Cole's admission of close acquaintance with Stacher was highly relevant as showing that Cole's motive in urging Benton to claim the privilege was to protect himself against a prosecution for perjury. See 329 F.2d at 442–443. Although the prosecutor in California did argue on one occasion that Cole didn't want Benton to testify because of a desire to protect clients of CFR, the Government's only burden there was to show some corrupt motive and negate Cole's "friendship" theory and did not preclude the New York jury from concluding, under proper instructions, that Cole's motivation in the California proceeding was not business related.

on recross that the judge who had presided in California had said "at the close of the trial" [10] that if the case had been tried to him without a jury, he wouldn't have wanted to rely on Benton's testimony as compared to Cole's. This was of limited relevance, since the truth of Benton's testimony was not placed in issue in the prosecution's redirect examination of Ball, the purpose of which, as indicated, was merely to put before the jury a more complete picture of what the California proceedings were about. Defense counsel apparently thought that in some way the California judge's remark would weaken the effect of the prosecution's redirect by discrediting Benton, although, in strict logic, if the California judge's remark had caused the New York jury to disbelieve Benton, it may simply have revived Cole's "friendship" theory, which would have been of no great aid to the defendants in the New York case. In any event, the prosecutor did not meekly stand by; instead, he announced at a bench conference that, although up to this point he had sedulously avoided reference to the result of the California trial, he now felt required to offer the judgment of conviction in order to show that the California jury had not shared the trial judge's views with respect to credibility. To put the matter a bit more fully, the defense's cross-examination of Ball had made it proper for the prosecution to offer Benton's testimony, which had now become an important part of its case; the defense had placed the truth of Benton's testimony in issue and had sought to discredit him by offering the California judge's remark; and the prosecution felt bound to rehabilitate him in the only way it could. Judge Pollack permitted introduction of the conviction "in view of the way in which the door has been opened by the defendant," but cautioned the jury in his charge that the California conviction did not constitute "evidence of the defendants' guilt on the charges of tax evasion in this case."

Appellants attack this ruling as violating this court's formulation of the "other crimes" rule, most authoritatively expressed in United States v. Deaton, *supra*, 381 F.2d at 117–118. The many cases cited are simply irrelevant to the special situation here. The defense had attempted to discredit the Government's evidence by showing that the trial judge would not have accepted the inferences, fairly derivable from Benton's testimony, that Cole was acting to protect Stacher, himself, or both, see n.9. While, as noted, this entire exchange was of only limited relevance on the issue of whether the California proceedings were business related, the Government was entitled to complete the picture by showing that the judge's views were not shared by the laymen whose task it was to determine credibility at Cole's California trial. The Government could have called the jurors for that purpose if they had been available; the conviction, under the judge's limiting instruction, had the same effect.

Two months before the trial in this case, Ball had instituted on Cole's behalf a *coram nobis* proceeding in the California federal court to vacate Cole's conviction on the ground that the indictment was a product of illegal electronic eavesdropping. The United States Attorney responded that the Government could prove that all the evidence used at Cole's trial had come from legal sources. A hearing was held in Los Angeles on December 30, 1970, a few days before the New York trial began. Ball at first urged the need for speedy action because of fear that the California conviction would be used to impeach Cole in the New York case. Later he indicated that while he would like an early ruling, the "possible impeachment of Cole was not the crux of the *coram nobis* proceeding," and the judge set a hearing for May 24, 1971. While appellants dispute Judge Pollack's statement, in his opinion denying a new trial, that none of this was made known to him, it is plain that defendants did not attempt to have the New

---

10. In fact this was on sentencing.

York trial postponed until the *coram nobis* petition had been decided. On May 21, after the verdict in the New York trial, the Government withdrew its opposition to the *coram nobis* petition on the ground that it had discovered additional records which had convinced it that it could not prove that the evidence came from an untainted source.[11] The California judge having vacated the conviction, defendants moved on June 3, 1971, for a new trial in this case. Judge Pollack denied the motion in an opinion.

Appellants challenge the denial on numerous grounds. They contend that but for the California conviction Cole might have taken the stand and also that since the Government had offered the California conviction in evidence, the vacating of this automatically entitles them to a new trial under Burgett v. Texas, 389 U.S. 109, 88 S.Ct. 258, 19 L.Ed.2d 319 (1967), Loper v. Beto, 405 U.S. 473, 92 S.Ct. 1014, 31 L.Ed.2d 374 (1972), and Beto v. Stacks, 408 F.2d 313, 316 (5 Cir. 1969), which prohibit the use of a constitutionally defective conviction in a subsequent trial to destroy the general credibility of a testifying defendant, to support his guilt, or to enhance punishment. Beyond this, appellants claim the Los Angeles United States Attorney knew all along that he could not successfully resist the *coram nobis* petition but deliberately stalled until after the New York trial, see note 11. This prosecutorial misconduct, they say, must be visited upon the prosecutor in New York, although they acquit him of personal involvement.

■ As in the case of their argument with respect to the use of prior convictions generally, appellants overlook the particular circumstances of this case. The California indictment and trial were an important element in the charge of tax fraud in New York, whether the Cali-

fornia proceedings were legal or not and whether Cole was convicted or not. When the New York trial began, the prosecutor stated that he did not intend to offer the California conviction; he was content to have the New York jury determine the issue of business relatedness from other evidence without ever knowing the irrelevant fact of what the California jury had concluded. It was the defense's introduction of the remark of the California judge on sentencing, even less relevant on the issue of business relatedness than the verdict, which allowed the Government to introduce the California conviction, the functional equivalent of testimony by the jurors, in order to show that the triers of fact did not share the California judge's low opinion of Benton's credibility at that trial, which the defense itself had put in issue. *Cf.* United States ex rel. Walker v. Follette, 443 F.2d 167 (2 Cir. 1971), seemingly approved in Loper v. Beto, *supra*, 405 U.S. at 482 n. 11, 92 S.Ct. at 1019 n. 11. Even if the conviction had been vacated prior to the New York trial as obtained by illegal means, the verdict would have been admissible to show the opinion of the twelve good men, and women, and true, if defense counsel had introduced the judge's remark. It may be, of course, that if the California conviction had been earlier vacated, the defense would have followed a different trial strategy in New York. But if the defense wished to preserve any point as to the illegality of the California conviction, it should have sought a continuance pending decision of the *coram nobis* proceeding or, at least, have objected to use of the conviction as being under attack so that the trial judge could have considered whether the best course would not be to strike the California judge's remark and refuse to allow the conviction in evidence, thus placing matters back where they were before the defense got

11. The Government has made these records available to appellants' counsel and to us in connection with this appeal. Unlike appellants, we do not see the records, and the circumstances surrounding their discovery, as demonstrating that Farber's initial request for the saturation investigation was based solely or primarily on the FBI reports, *infra*, or that the government purposely delayed its acknowledgment of the validity of the *coram nobis* proceeding.

the case so far off the track of true relevance. We see no reason to order a new trial because of the now demonstrated illegality of Cole's prior conviction when it was defendants' own trial tactics that brought the conviction on the stage and they made no attempt to prevent its introduction on that ground. While *Loper* prevents the prosecution's use of a constitutionally defective conviction to impeach the defendant when the only defense "strategy" is to put the defendant on the witness stand, that decision also recognizes that when the defense elicits certain false or misleading statements from a defense witness which directly relate to a specific criminal proceeding, the prosecutor may then be permitted to counter by proof of a constitutionally defective conviction. The defense's use of the judge's remark to attack Benton's credibility likewise invokes that principle.

### III.

The Government concedes that from May 5, 1961 until August 29, 1962, the FBI illegally maintained electronic eavesdropping devices in Cole's offices at CFR and in various hotel and motel rooms which he occupied. The original purpose of placing these "bugs" apparently was to assist in a full-scale investigation of Stacher, who was believed to hold a high position in organized crime and to own undisclosed interests in Las Vegas gambling establishments, with a view to a prosecution for tax evasion on a large scale.[12] However, the log for May 16, 1962, included a conversation between two of Cole's associates revealing in some detail that Cole was charging to CFR a variety of personal expenses similar to those for later years which have been discussed in Part I of this opinion. Other logs contained additional conversations with respect to the charging of personal expenses, including one item relating to the legal fees in resisting the obstruction of justice charge.

Prior to trial, appellants moved for dismissal on the grounds that the tax investigation leading to the indictment stemmed from this illegal electronic eavesdropping and that the Government would rely on tainted evidence. The judge denied this without prejudice to renewal at the close of the trial, when he would be better able to analyze what evidence the prosecution had used. The motion was so renewed and, after a four-day hearing, was denied in an opinion, 325 F.Supp. 763 (S.D.N.Y.1971).

Since there is no claim that any evidence obtained by the eavesdropping was itself introduced because the acts forming the basis for the indictment, with one technical exception, had not yet been committed when the bugs were removed, the question becomes whether the connection between the remarks illegally overheard with the later "saturation investigation" of CFR, and the evidence thereby developed, was such as to require the grant of immunity to the defendants for income tax evasion in subsequent years.[13]

The controlling principle was stated in Wong Sun v. United States, 371 U.S. 471–487–488, 83 S.Ct. 407, 417, 9 L.Ed. 2d 441 (1963):

> We need not hold that all evidence is "fruit of the poisonous tree" simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary

---

12. At some point in the Stacher investigation, the FBI compiled sufficient information on Cole to warrant a separate file with respect to his activities. ·

13. Although appellants correctly point out that the conspiracy count of the indictment began on September 30, 1961, when the "bugs" were still in use, they have not cited any overt acts proven at trial which may have been directly learned by the bugs.

taint." Maguire, Evidence of Guilt 221 (1959).

We have applied that principle to varying fact situations in such cases as United States v. Tane, 329 F.2d 848 (2 Cir. 1964) and United States v. Edmons, 432 F.2d 577 (2 Cir. 1970), where we reversed convictions or dismissed indictments, and United States v. Schipani, 414 F.2d 1262 (2 Cir. 1969), cert. denied, 397 U.S. 922, 90 S.Ct. 902, 25 L.Ed.2d 102 (1970), and United States v. Friedland, 441 F.2d 855 (2 Cir.), cert. denied, 404 U.S. 867, 92 S.Ct. 143, 30 L.Ed.2d 111 (1971), where we sustained them. Nothing would be gained by repeating what was said in those opinions, with one exception. It seems not to be sufficiently realized that the *holding* of the district court in *Schipani*, 289 F.Supp. 43 (E.D.N.Y.1968), which we affirmed, was that the Government had met its burden of showing by a preponderance of the evidence [14] that it would have launched the saturation investigation which developed the evidence leading to Schipani's conviction even if no information had been received from illegal electronic surveillance of a travel bureau. It was with respect to this—not to everything *said* in the course of a 22-page opinion by the district judge—that Judge Jameson, writing for the court, "approve[d] the legal principles applied," 414 F.2d at 1266.

Careful review of the record convinces us that the Government likewise met that burden here. Benjamin Farber, an Assistant United States Attorney in Los Angeles, was in charge of the Stacher investigation. On June 21, 1962, Benton came to Farber and volunteered that Cole and Stacher were close business associates, that Cole himself owned hidden interests in certain Las Vegas gambling establishments, and that Cole and Stacher frequently took "gravy money" from these without declaring it as income.[15] Benton elaborated on this in a manner described by the district court as follows, 325 F.Supp. at 770:

> Benton told Farber that during the time he was employed at Cole, Fischer & Rogow, he met a number of people at the office of the advertising agency connected with the Sands Hotel. Men from the hotel came with bundles of money on which there would be a little slip. The money would be tossed into a file cabinet. Cole told Benton that sometimes it was as much as "200,000 bucks", but "with our setup, we're not worried about having anybody steal it". Another time, on a Monday around noon, he said, a chap would come in with a black brief case, containing a flat pack of bills which was handed to Cole. The latter explained that this was the money stuffed into cans beneath the gambling tables—the gravy money that is never reported. Cole received a cut of these moneys which was not declared. Cole told Benton that he had 8⅔ points in the Sands Hotel; that this had been given to him by members of the family so that he could get into the Sands Hotel, since Cole didn't have any money and they had given him enough money so that he could buy into the Sands Hotel.

Prior to Benton's visit Farber had been receiving regular reports from FBI Special Agent Zellers which were based in part on the contents of the logs, including a report as to Cole's charging personal expenses to CFR.[16]

14. That this is the proper standard follows *a fortiori* from Lego v. Twomey, 404 U.S. 477, 487–489, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972) (voluntariness of confession).

15. Benton also narrated statements by Cole similar to those in the third paragraph of note 7, *supra*.

The appellants argue the Government did not meet its burden of proving that Benton himself was free from taint. This contention must fail. The Government demonstrated at the taint hearing below, and the district court found, that its knowledge of Benton derived from independent, legal sources.

16. The Government claims that Farber did not know the true source of the information in these reports which was described only as informant "LA T–153." The appellants contest this with some force. We find it unnecessary to resolve the dispute because Farber's knowledge whether "LA

Later in the summer Farber asked Louis Scalzo, an attorney in the Organized Crime Division of the Department of Justice, to request the Internal Revenue Service to undertake a "saturation investigation" of CFR. Farber testified as to his motivation as follows:

The Benton information and the information pertaining to the Las Vegas hidden interest was, to me, the most dramatic, and the most appealing. I think maybe I was thinking in terms of gang buffeting or racket buffeting and for that reason these reasons were the types of things that seemed to make the biggest impression upon me.

I, on the other hand, am sure that the other information [from the FBI reports] must have played some part.

In its letter of October 3, 1962, to the Commissioner of Internal Revenue requesting the investigation, the Department referred to information that Cole was closely associated with Stacher and that Cole acted as Stacher's representative in connection with an undisclosed interest in gambling at the Sands Hotel. This information, contained in Benton's statement, was from an untainted source. Nothing was said in regard to taking deductions for personal expenses.

■ Judge Pollack found as a fact that Benton's statement "catalyzed the request to IRS of the desirability of in-

vestigating Cole's income taxability and returns." 325 F.Supp. at 770. We see no basis for disagreement; indeed, we think this understates the case. Assistant United States Attorneys and attorneys in the Department of Justice are obviously aware that the resources of the Internal Revenue Service do not permit saturation investigations of every taxpayer who charges a trip by his wife or children as a business expense. Such time-consuming methods of investigation must necessarily be reserved for serious cases. Failure to disclose the receipt of "as much as '200,000 bucks'" a week from a man believed to be a figure in organized crime would warrant a saturation investigation; the practice, regrettably too common, of taking a business deduction of a few hundred or even a few thousand dollars of personal expenses would be left, in the first instance, to ordinary audit procedures. While Farber candidly admitted that the personal expense deductions "must have played some part" in his decision, it is clear both that he would never have sought—or obtained—a saturation investigation on that ground alone and that he would have sought it—and in fact obtained it—on Benton's information alone. Conduct is not a legal cause of an event if the event would have occurred without it. Prosser, Torts § 41 at 239 (1971 ed.).

Although, once the saturation investigation [17] was ordered,[18] discovery of the

---

T-153" was an illegal source is irrelevant to the question of the effect of the tainted information on Farber's decision.

17. A Government witness characterized such an investigation as one that would "leave no stone unturned in determining the correct tax liability of the taxpayer, if any." Although the auditing procedures employed in such an investigation are not made public, 26 C.F.R. § 601.701(b) (ii) (1972), testimony at the taint hearing by Internal Revenue Service investigators indicated that every conceivable avenue of tax evasion is thoroughly examined and, when possible, independently verified.

18. The invetigation was long in coming. IRS Agent Sullivan, who was assigned to

it, was occupied with the Stacher investigation. Also the indictment against Cole for obstruction of justice was filed in October of 1962, and Farber instructed Sullivan not to pursue the tax investigation until the obstruction of justice charge had been resolved. Not until October 1964 did Sullivan request the CFR income tax returns and records. The taxpayers resisted production of the records, and legal proceedings had to be instituted. When the Government's right of access to the records had been established, the IRS was informed, for the first time, that all corporate records prior to 1963 had been destroyed. Appellants' contention that the order directing production of the records was itself tainted by perjurious testimony by Sullivan and

improper deductions was inevitable, appellants contend there was a focusing on the deduction of personal expenses which resulted from the original taint. They showed, in support of this, that in the fall of 1963 Sullivan read the FBI reports on the bugging logs and made 43 pages of handwritten notes, one item of which read:

> "General comment—various unidentified sources:
>
>> 'That Cole, for years, has charged all his personal expenses, as well as his family's personal expenses and living expenses, to his firm—all of these charges being made on credit cards.'
>
> "It is not indicated how these persons knew this to be a fact."

Also, after his recommendation that the saturation investigation be abandoned was rejected in the spring of 1964, he prepared a work plan, one line of which under the heading "Probable Required Inquiries" referred to "Personal expenses charged to business."

 The analysis of CFR's records finally got under way on June 8, 1965 and continued through August 27. It was conducted under the supervision of Revenue Agent Robert Zagorin. Neither he nor any of the agents working under him had any knowledge of the bugging or of the FBI logs. His description of the many tasks he performed takes up nine pages of the hearing transcript. While he knew from Sullivan that one basis of the investigation was personal expenses charged to the corporation,[19] he had been given no specific leads and did not even reach the subject of charges for personal expenses until the third week of his study. It would be a poor "saturation investigation" that

did not embrace this common method of tax evasion; indeed, one would suppose this would be among the first items even in an ordinary field audit. The short of the matter is that once it is concluded that the "cause" of the saturation investigation was Benton's lurid account of Cole's participation with Stacher in taking a share of the cash profits of Las Vegas gambling without reporting this as income, the investigation, without any assistance from the bugging, was bound to and did develop the charging of personal expenses to the business. It is immaterial that, for whatever reasons, the Government was unable to substantiate the allegations by Benton that had led to the investigation. In United States v. Paroutian, 299 F.2d 486 (2 Cir. 1962), we said that the question is not whether the government would have, in the normal course of events, discovered the evidence by independent legal sources, but whether in fact they did actually make the discovery from independent legal sources. Our holding today does not undermine that rule, because we find that the Government proved that the evidence resulted from the legal saturation investigation, rather than from any illegal information as to personal expense accounting.

The United States does not ask us to condone its illegal actions a decade ago, which indeed deserve the sharpest condemnation. We hold only that it sustained the burden of showing that its knowledge of the facts on which these defendants were convicted of income tax evasion in 1963 and 1964 was "gained from an independent source." Silverthorne Lumber Co. v. United States, 251 U.S. 385, 392, 40 S.Ct. 182, 64 L.Ed. 319 (1920).

The convictions are affirmed.

---

prosecutorial misconduct was not made below and, in any event, is without merit.

19. Another was an unexplained increase in Cole's net worth.